## FLEMING v. A. H. BELO CORPORATION.
### No. 9867.

Circuit Court of Appeals, Fifth Circuit.
June 27, 1941.

Irving J. Levy, Asst. Sol., U. S. Dept. of Labor, George B. Searls, Atty., U. S.

Dept. of Labor, both of Washington, D. C., and Llewellyn B. Duke, Regional Atty., U. S. Dept. of Labor, and Robert W. Richards, both of Dallas, Tex., for appellant.

Eugene P. Locke and Maurice E. Purnell, both of Dallas, Tex., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Alleging that defendant was subject to the Fair Labor Standards Act of 1938, U.S.C.A. Title 29, § 201 et seq., appellant brought this suit to enjoin it from violating the provisions of Sections 15(a)(1) and (a)(2), of the act.

The claim was that in violation of Section 7(a),[1] it had employed certain of its employees for work weeks longer than 42 hours, and had failed to compensate them, for overtime, at rates not less than one and one-half times the regular rates, at which they were employed. The defenses were; a denial that defendant was subject to the act; a general denial; and an affirmative claim, that in order to conform with the act, while continuing to pay its employees a fixed weekly salary, as it had been doing before the effective date of the act, defendant, by agreement with them, had provided; for a basic rate of pay; for payment of overtime work performed in each week, at a rate not less than one and one-half times such basic rate of pay; and for a guarantee that the aggregate pay each week for regular work, and overtime work, performed would amount to not less than a certain, definite fixed sum.[2] A great deal of testimony was taken, some on the jurisdictional point, but most of it on the merits.

On the jurisdictional point, the testimony was sufficient to support the finding that defendant, as to the employees in question, was subject to the act. On the merits, it all came down to this, that the defendant had made with each of its employees, an actual bona fide contract of employment, stipulating a basic hourly rate of pay, providing for payment, for overtime work performed, at a rate of not less than one and one-half times such basic rate of pay, with a guarantee that the aggregate pay for regular and overtime work performed, would amount each week to not less than a certain, definite sum fixed in the employment contract; that instead, for the purpose "of overtime payment, of taking as the regular rate at which he is employed", the rate contended for by plaintiff, a rate arrived at by dividing the weekly salaries of each employee, by the total number of hours worked each week, the defendant took as to each employee, the regular hourly rate stipulated in his contract of employment; that this rate in all cases, was above, and in most, far above, the minimum rate required by the statute; and that on the basis of this rate, defendant

---

[1] Sec. 7. (a) "No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

[2] As set out in its answer, this was its defense. "At and prior to the effective date of the Fair Labor Standards Act of 1938, defendant was paying its employees on a weekly salary basis. With the possible exception of a few office boys, it was paying each of such employees as much or more than the minimum wages prescribed by said Act. Defendant considered it to the best interests of itself and its employees to continue paying on such basis insofar as it could do so in conformity with said Act. Defendant gave due consideration to said Act with the purpose of conforming fully to its requirements irrespective of the question of its constitutionality and of its applicability to defendant or to its employees. With this end in view, defendant established a basic rate of pay for each of its employees with provision for payment for overtime work performed at a rate of not less than one and one-half times such basic rate of pay and with a guarantee that aggregate pay each week for regular work and for overtime work performed would amount to not less than a certain definite fixed sum. This arrangement was consummated by contract between defendant and each of its employees; it has been adhered to since the effective date of said Act; it is satisfactory to defendant * * * and insofar as defendant knows * * * it is satisfactory to each and all of defendant's employees."

had each week paid at least, in some weeks more, and in other weeks much more, than time and a half for overtime.

The district judge, of the opinion;[3] that nothing in the statute was intended to, or did, prevent defendant and its employees, from contracting with each other as to the regular rate at which each employee was to be employed, so long as this rate was not below the minimum fixed by statute, and the employee was paid at least one and a half times that regular rate for overtime hours worked each week; that the law and the facts were with defendant and against plaintiff; and that the action had failed for want of equity; entered a judgment dismissing it.

Plaintiff is here urging upon us; that its Interpretative Bulletin, No. 4, Maximum Hours and Overtime Compensation on Salaried Employees,[4] and the opinion of its general counsel,[5] set out therein, must be

[3] Fleming v. Belo Corp., D.C., 36 F. Supp. 907.

[4] "If the employee is on a weekly salary basis, his regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the regular number of hours worked or if no regular number of hours is worked, by the total number of hours worked each week. If the employee works a regular number of hours, the regular hourly rate of pay will be a fixed rate, remaining unchanged from week to week. But if the employee works a fluctuating and not a regular number of hours, his regular hourly rate of pay will be the average hourly rate for the week and will vary from week to week.

[5] Sec. 18. "Section 7 of the Act requires that overtime must be paid at the rate of time and one-half the 'regular rate' of pay at which the employee is employed. Time and a half must, therefore, be paid upon the rate at which the employee is actually employed and paid and not upon a fictitious rate which the employer adopts solely for bookkeeping purposes. An examination of the methods suggested by employers as a means of continuing to work overtime hours without any increased wage bill will demonstrate the illegality of adopting a bookkeeping rate for purposes of the Wage and Hour Law and a different rate for any other purpose. Resorting to these methods will constitute a violation of Section 7 and will subject the employer to the penalties prescribed in the Act."

"I. Salaried Employees. 19. It is clear that an employer will violate the Act if he simply pays no attention to its requirements next October 24 but continues to work his employees the same number of hours (in excess of 42) they now work for the same salary they now receive. In our opinion an employer who will continue to work his employees in excess of 42 hours after October 24 for the same salary they now receive but who takes the trouble to manipulate the rates of pay in order to adopt a rate upon which he may calculate the time and a half, without incurring any additional labor cost, stands in no better position than the employer who simply and frankly disregards the overtime requirements of the Act.

20. "Employers have proposed two principal methods of avoiding overtime payment to salaried employees. The employer, by one plan, will announce that henceforth the employee is employed either at the rate of 30 cents an hour or at an hourly rate in excess of the minimum. But each week the employer will pay the employee a 'bonus' to make up the fixed salary. Obviously, the employee will not actually be paid at the rate adopted by the employer for overtime calculation. His regular rate of pay for overtime purposes must be based on the total weekly earnings including the bonus.

21. "The employer eliminates the 'bonus' feature in the second method. If the employee works an irregular number of hours the employer proposes to adopt a different rate each week upon which to compute overtime. Each week the employee's earnings, on the basis of the adopted rate for 42 hours and time and a half such rate for the excess hours will equal or approximately equal the fixed salary. Thus, for example, if an employee, during the course of a month, works 43, 46, 52, and 48 hours respectively, the employer, to continue paying him $21 weekly, will adopt 48 cents, 44 cents, 37 cents and 41 cents as the respective rates of pay. Obviously, these rates are pure bookkeeping figures and the regular rate of pay on which overtime must be paid will be determined by dividing the $21 weekly salary by the hours worked each week.

22. "If the employee works a regular number of hours, the employer proposes to adopt a rate, which for 42 hours and at time and a half such rate, for the hours in excess of 42, will yield the present earnings. The fact that the computations on the adopted rate will produce a figure equal to the employee's present total compensation cannot obscure the real situation. This employer will be in no better position than the employer who proposes to adopt the

accepted as a proper interpretation of the meaning and application to the facts of this case, of the statutory provision that overtime must be compensated "at a rate not less than one and one-half times the regular rate at which he is employed", and insisting that the findings and judgment of the trial court do violence to the statute, and may not stand.

Federal Rules of Civil Procedure, Rule 52, 28 U.S.C.A. following section 723c, provides that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given the opportunity of the trial court to judge of the credibility of the witnesses." Upon a full disclosure, and upon a record, which not only does not show them to be clearly erroneous but lends the support of undisputed testimony to the findings, the district judge found; that the contracts between employer and employee were actual bona fide contracts of employment; that they were intended to, and did, really fix the regular rates at which each employee was employed; and that as made and carried out, they compensated the employees at a regular rate considerably in excess of the minimum fixed by the statute, and for overtime at a rate not less than one and one-half times that regular rate. While then, the meaning of the statute must be drawn as a conclusion of law from its language as a whole, the question of its application to the facts in this case, must be examined by us from the standpoint of those findings, and not from the standpoint of appellant's assumptions, that the arrangements, made between employer and employee, were not real contracts for employment, but were fictitious and unreal, a mere sham and pretense behind which appellee masked, to stalk and defeat the statute and its purpose.

Examined in the light of the district judge's findings, we think it may not be doubted that the district judge was right in his conclusion, that what appellee and its employees did, was not a violation, but a carrying out, both of the letter, and the purpose of the statute, as that purpose is expressed in the language it employs.

Appellant recognizes; that the payments made to the employees are not, as absolutes, in question here, as substandard wages; that if appellee had changed the form of its employment contracts to conform to appellant's view, it could have paid its employees considerably less than it did, and still have been within the law; that the minimum wage provisions of the act are not involved; and that appellee's labor policies are not in issue. It has brought this case and has stood throughout, upon the bold proposition,[6] that where weekly salaries are paid, no matter how large the salary or how it was arrived at or agreed to, the "regular rate" referred to in the statute must always, and can only, be determined, by dividing the weekly compensation, by the total number of hours the employee actually works during each work week, and employer and employee cannot contract otherwise.

Appellant does not support this position by pointing to words in the act which purport to prohibit agreements, as here, between employer and employee fixing "the regular rate at which he is employed," and agreeing to pay, for overtime, at a rate more than one and one half times the regular rate fixed by the agreement. Nor does he support it, by pointing to provisions in the act, in any wise limiting the amount

minimum wage as the overtime rate with a 'bonus' scheme, or to juggle the rates from week to week. This employer seeks to adopt one rate for overtime purposes, but will expressly or impliedly guarantee his employees another—based upon the weekly salary. The regular rate of pay on which overtime must be based will be determined by dividing the weekly salary by the regular number of hours worked."

6 As stated in the brief, "the regular rate of pay as used in Sec. 7 means the employee's fixed weekly wage translated into its hourly equivalent, that is, the total fixed weekly compensation which the employee is actually paid, divided by the total number of hours actually worked by the employee during the work week, the term 'regular rate' is used in contradistinction to overtime rate.

"The regular rate is primarily the employee's rate of actual earnings, the money he actually received in relation to the amount of time he actually works. In a case such as the one at bar, where the employee is paid a fixed weekly salary without regard to the number of hours he works each week, the regular rate for each work week is the hourly equivalent of the fixed weekly salary * * *. On the facts of this case it cannot be said that the fixed weekly salary included overtime compensation because as a matter of fact, the full salary was earned by the employee when no overtime was worked."

of overtime that may be worked and paid for. Of course, he cannot do this since the act contains absolutely none, and in his Interpretative Bulletin No. 4, he has declared: "It is clear that there is no absolute limitation upon the number of hours that an employee may work. If he is paid time and one-half for overtime, he may work as many hours a week as he and his employer see fit." His only support for his position that the act has this effect, is the claim that the general purpose of the act as expressed in Section 2, shows that it was designed and drawn to penalize and limit overtime. His only attack upon the agreements is, that thereby defendant has been enabled to continue to pay, without increasing it, the same compensation he paid before the act. His insistence is that the act must be construed and applied as he contends for, and defendant must be required to pay more than it agreed to pay and its employees agreed to receive, because the pay which by the agreement was fixed to cover both regular and overtime, must, under that construction, be considered as covering only regular time, and for the overtime worked, there must be additional compensation.

[redacted] We cannot agree with appellant that the statutory words under consideration, "regular rate at which he is employed", are at all ambiguous, or that for their construction they require resort to the declaration of policy and the legislative history of the act. We think it clear that their meaning is plain and simple and their application equally so. In cases where there is no express agreement as to the regular rate at which the employee is employed, but only an agreement for a weekly wage, appellant's method of arriving at the regular rate by assuming that the wage stipulated for is not intended to cover overtime worked, would, we think, be unexceptionable. But in cases where, as here, the contract of employment fixes the regular rate, that method will not do, for here within the very words of the statute, "the regular rate at which he is employed", is fixed as to each employee in his contract of employment.

But, if we could agree with appellant, that the words of the act are ambiguous and that for its construction, resort to the purpose clause and the legislative history of the act is necessary or proper, we can find nothing in either to support appellant's view. Section 2 deals with doing away with a substandard, and the establishment and maintenance of a minimum standard, of living. It says nothing about spreading the work or reducing hours of working. Section 2(b) declares it to be the policy of the act, through the exercise by Congress of its power to regulate commerce, "to correct and as rapidly as practicable to eliminate the conditions above referred to ["Labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers."] in such industries without substantially curtailing employment or earning power." Section 5 provides for industry committees whose business shall be to make the recommendations provided for in Section 8. Section 6 provides for minimum hourly wages. Section 7, the section in question, does not at all fix maximum hours, it merely provides what shall be the maximum weekly hours, during which an employee may work at the regular rate at which he is employed, and that, except where as the result of collective bargaining, employer and employee otherwise agree, for every hour over, that he works, he shall be compensated at a rate, not less than one and one-half times the regular rate. Section 8, the section which implements the policy section of the act provides in subsec. (a), "with a view to carrying out the policy of this act [chapter] by reaching, as rapidly as is economically feasible without substantially curtailing employment, the objective of a universal minimum wage of 40 cents an hour in each industry engaged in commerce or in the production of goods for commerce the Administrator shall from time to time convene the industry committee for each * * * industry and the industry committee shall from time to time recommend the minimum rate or rates of wages to be paid under Section 6 [section 206]."

[redacted] If then, we are, as appellant contends, to find the meaning of the act, its prohibitions and commands, not in the language, of its implementing clauses, which the Congress has chosen to express that meaning, but in the general purpose, thought to animate it, the title of the act, "Fair Labor Standards Act", the complete absence from the act of any prohibition against or limitation upon working extra hours, any prohibition against or limitation upon the making of agreements by employers with their employees, the expressions in Section 2, and particularly the provisions

of Section 8, would compel us to conclude, that the purpose of the act is to establish and gradually raise minimum wages, that the overtime provisions in it are inserted not at all to discourage or limit overtime work but as a part of the scheme to raise substandard wages by providing a definite pay for overtime work when such work is required; and that nothing in it purports to or does at all impair the right of employer and employee to contract as they have done here. When we turn to the legislative history of the act, appellant stands no better. For there is no reference in the whole legislative history to prohibiting agreements between employer and employee, as here, for all inclusive and regular weekly salaries, none whatever to the effect that it was intended that persons already paying more than the minimum wage the act provided, should be compelled to pay still more. The legislative history of the act, while showing as the legislative history of all new and controversial acts does some individual differences of opinion, adds up to showing, as to the overtime provisions, only what the act shows, that in broad outline the Congress intended that for overtime work, time and a half, the regular rate of pay at which each was employed, should be paid each employee. How that regular rate should be arrived at, when it was fixed above the minimum, was not, for all that appears in the briefs of the parties, and we have not otherwise had access to the debates or committee reports, dealt with in the debates on the bill, either in the original passage of it, or in amendments offered to it, except to say that wages above the minimum must be left to bargaining between employee and employer.[7] When all is said and done, appellant comes in his argument to this point; that the law should be construed as he contends for, because in the opinion of the administrator, the law would better serve its purpose if it were drawn that way. Appellant overlooks the fact that a legislative act in the United States is not as in some countries, a mere general outline by a party or group in power, of the purposes it wishes to accomplish, to be expanded, implemented and given effect by its administrators, in accordance with the general purposes of its proponents. A fundamental fact in American political life has always been that in the struggle here for laws as means, to make law as liberator effective, there have always been differing opinions as to the wisdom, propriety and scope of proposed new and controversial laws, and that laws as finally enacted here, are usually the result of a compromise or at least of an adjustment of these conflicting views.

Because this is and always has been so, it can be usually said of our laws, that the *general, not the partial or partisan will*, speaks in them. It is because this is so, that canons of statutory interpretation and construction require that statutes must be construed and given effect, in accordance with the language chosen for the expression, of this compromise and adjustment of views, and not in accordance with the purposes or views, of either the proponents or the opponents of the legislation, which have not been given expression in the statute.

 The issue presented here by the claim of the appellant that though the statute does not say so, it must be construed to give full effect to the purpose of placing him as administrator of the act in a tutelary position, the employer and employee

---

[7] *For instance, Senator Black, Congressional Record, Vol. 81, p. 7808, July 29, 1937:* "The Committee was of the opinion that it was not wise for the Federal Government to attempt to fix wages in this country above the minimum. The Committee was of the opinion that that should be left to bargaining between the employees and the employers, and that the jurisdiction should be left at that point—simply to provide a minimum wage."

And Senator Borah, Vol. 83, p. 9175, June 14, 1938:

"We are not dealing here with anything except minimum wages, and those in my opinion are fixed upon one genuine principle and that is the amount of wages necessary to maintain a family and build up and to maintain the citizenship of the country. That is all we are dealing with.

\* \* \* \* \* \* \* \* \* \*

"Congress has no authority to deal with other wages. All wage earners have a constitutional right to bargain for whatever wage they choose. The Federal Government only has authority to deal with minimum wages because minimum wages and hours of employment relate to the health and general welfare of the citizens and it legislates in this field solely because it can be justified on humanitarian grounds. Both federal and state constitutions forbid the fixing of any wage by law other than the minimum."

in a state of tutelage to him, so that they no longer have a right to fix their wages by agreement, but must fix them according to the legalistic interpretative formulas of the administrator's general counsel, brings this into sharpest focus. It may be admitted that there is a section of opinion in this country and in the Congress, sufficiently collectivistic to prefer the tutelary system for which the administrator contends, and that if they had had sufficient voting power, they would have so provided in the law. It must be conceded however on the other hand that there is another section of opinion both in the nation and in the Congress, which is not so collectivistic and still believes in reasonable freedom of contract. It is just because of this fact, that legislation is compromise, that the views of the proponents and of the opponents, as to the purposes and effect of the legislative act, are never regarded as of value in a construction of it, and that it is settled law that statutes must be construed in accordance with the intent of the legislature as expressed in the language of the act as a whole. Its meaning may not be sought by the courts in the vague penumbrae of the wishes and desires of its proponents or its opponents as these are expressed in debates. Particularly, may it not be sought in the purely legal interpretation by the administrator's legal staff, for if this were so, the administrator would find himself, not only in the powerful position he properly stands in, of administrator for the Congress of one of its laws, as plaintiff bringing suit in the name and power of the United States to enforce the law, but, by issuing a binding interpretation of it before he brings his suit, in the position of a judge in his own cause who has written his decision before hand.

For us to agree that such interpretations are binding on us would require us to entertain the view, the contrary of that uniformly taken both by Congress and the courts, that law as well as fact, should be and has been delegated to the administrator. The authorities appellant cites[8] in support of his view that the administrator's interpretation should be followed here, do not, we think, at all support him. In the Trucking Company case, the majority clearly states the applicable rule, "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. * * * When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. * * * The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said." The interpretation given weight there was the settled practice of the I. C. C., as to its jurisdiction under the Motor Carrier Act, 49 U.S.C.A. § 301 et seq., both before and after the enactment of the Wage and Hour Act. It was not, as here, the purely legal opinion of the administrator's counsel nor was it an interpretation which would abrogate the right of contract, to substitute an arbitrary, for a conventional method of arriving at the regular rate at which each employee is employed.

It is true, that as quoted in appellant's brief, the opinion did say at page 549, of 310 U.S., at page 1067 of 60 S.Ct., 84 L. Ed. 1345, that "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they were yet untried and new", was entitled to great weight. But this was a quotation from the opinion of the Supreme Court in Norwegian Nitrogen Company v. United States, 288 U.S. 294, at 315, 53 S.Ct. 350, 77 L.Ed. 796, a reference to that case and the authorities it cites, makes it entirely clear that the court was not intending at all to depart from the established rule; that where a statute is ambiguous or uncertain, the practical interpretation by the Executive Department charged with its administration, is entitled to the highest respect and if acted upon for a number of years, will not be disturbed except for very cogent reasons. United States v. Moore, 95 U.S.

---

[8] United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345; United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. ——, 132 A.L.R. 1430.

760, 24 L.Ed. 588; Logan v. Davis, 233 U.S. 613, 627, 34 S.Ct. 685, 58 L.Ed. 1121; Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457; Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397; I. C. C. v. New York, N. H. & H. R. Co., 287 U.S. 178, at 190, 53 S.Ct. 106, 77 L.Ed. 248. It was certainly not intended thereby to announce the new and heretical doctrine put forward by the administrator, that the newer the statute, and the more recent the legal interpretation of it by the administrator's counsel, the more binding that interpretation on the courts.

The Darby case is not authority for, it is authority against appellant's contention that the purpose of the act was to spread the work by discouraging and penalizing overtime work and pay. In the Darby case [312 U.S. 100, 61 S.Ct. 457, 85 L.Ed. ——, 132 A.L.R. 1430], the Supreme Court said of the act that the motive and purpose was, "plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions", and again at page 122 of 312 U.S., at page 461 of 61 S.Ct., 85 L.Ed. ——, 132 A.L.R. 1430, "As we have said the evils aimed at by the Act are the spread of substandard labor conditions through the use of the facilities of interstate commerce for competition by the goods so produced with those produced under the prescribed or better labor conditions", and again on page 125 of 312 U.S., at page 462 of 61 S.Ct., 85 L.Ed. ——, 132 A.L.R. 1430, "Both provisions are minimum wage requirements compelling the payment of a minimum standard wage with a prescribed increased wage for overtime of 'not less than one and one-half times the regular rate' at which the worker is employed." There is nothing here about spreading the work, nothing about penalizing overtime, nothing about abrogating the right of contract, nothing about requiring an employer to further raise wages already far above the substandard struck down and the minimum standard set up in the act.

Freedom of contract, within constitutionally valid limitations, is, in the United States of America, one of the fundamental freedoms and this is particularly so in regard to labor relations. When, then, it is contended as here, that a statute has cut off or limited this freedom, a litigant, must point to something more than his opinion that it ought to be cut off or limited, must point to language clearly and validly so providing. There is no more authoritative principle in the field of labor law than that, subject of course, to valid statutes designed to prohibit substandard conditions and unfair labor practices, wages, hours, and work conditions are the proper subject of contract between employer and employee and their agreements must be, and are, given full effect in the courts.[9]

Here it is undisputed and found by the court, that, desiring to maintain and continue a system of fixed and regular weekly salaries in strict and full compliance with the Fair Labor Standards Act, employer and employees freely and voluntarily entered into agreements having that effect. These agreements; fixed the regular rate of pay at which each was employed, at a figure considerably above the minimum standard wage the statute fixes; provided for a weekly compensation large enough to pay at least one and one-half times that regular rate for any overtime which he might be required to work each week; and based upon experience over the years, guaranteed a weekly salary to each employee in an amount which would, in some weeks, be more, in none less than would be due them, at that rate, for the regular and the overtime hours worked in any week.

A great deal of the record, and of the briefs of the parties is devoted to a showing on the part of appellee that by its system, it, from the beginning, paid each employee more than he would be paid under the system which appellant wishes it to adopt, and by raises given since, it has paid and is paying each still more, and on appellant's part, that by its system it pays them less than appellant's ruling would provide.

9 It is hornbook law that the relation of master and servant is contractual, 18 R.C.L. Sections 1 to 7, pp. 490 to 496. "Ordinarily a special contract fixing the terms and conditions on which one party shall serve another is, in the absence of proof altering or rescinding it, conclusive." Id. Sec. 6, Contracts, Vol. 6, page 692 et seq. Collective bargaining grounds on these principles. System Federation No. 59 v. Louisiana & A. R. R. Co., 5 Cir., 119 F.2d 509, and cases cited therein. Yazoo & M. V. R. R. v. Webb, 5 Cir., 64 F.2d 902. Rentschler v. Missouri Pac. R. R., 126 Neb. 493, 253 N.W. 694, 95 A.L.R. 1, and note.

But all of this is entirely beside the mark. Whether Congress could constitutionally fix a minimum wage and then compel employers wishing to provide for fixed weekly salaries to pay a wage higher than the minimum so fixed, might raise a serious constitutional question. That question is not before us, for nothing in the act purports to make this requirement of an employer. Appellant does not so contend. His contention, stripped of all irrelevancies and confusions, really comes down, under the controlling law, to a contention of fact; that the testimony of the employer and its employees that they have agreed, as they testified they did, is false; that there was no agreement; that there was mere bookkeeping to give the appearance of reality to an arrangement fictitious in fact, and a fraud upon the act. But in what the fiction or the fraud consists, except that the agreement is not in accord with appellant's views as to the purpose of the act, is not made to appear. It may be that Congress could validly, and should have, written a provision into the law forbidding contracts such as those made here, but that is a question for Congress, not for the administrator or the courts. It certainly was not the question the employer and employee were confronted with when they made their agreements. That was not the question the district judge dealt with. It is not the question with which we have to deal. All the district judge was asked to and did decide, was whether the parties made the agreement they claimed to have made and whether they could in law make such an agreement. We think it perfectly clear that the finding that they could and did is supported in fact and in law, and that the judgment should be affirmed.

Affirmed.

SIBLEY, Circuit Judge.

 I concur in the philosophy and the conclusions of Judge HUTCHESON'S opinion. I wish only to emphasize that the wage agreements before us are actual, deliberate contracts intelligently made, and not mere bookkeeping or a scheme to evade the Fair Labor Standards Act. They are made mainly with the editors and reporters and those who assist them in producing a daily newspaper. The employees in the mechanical departments have union agreements not here involved. The time that editors and newsgatherers must work is necessarily very variable and unpredictable. When things are quiet, a few hours a day may suffice. In times of news activity a twelve hour day may be required. It is practically difficult to make a fair working agreement based on hours worked. The agreements here in question are similar in form and recite the requirements of the law as to minimum wages, maximum hours and overtime pay, and conclude thus: "In order to conform our employment arrangements to the scheme of the Act your basic rate of pay will be 75 cents per hour [10] for the maximum number of hours each week as specified by the Act, and that for time over the maximum number of hours specified you will receive for each hour of work not less than one and one-half time such basic rate above mentioned, with a guaranty on our part that you shall receive weekly for regular time and such overtime as the necessities of the business may demand a sum not less than $45.00." The proposal was accepted in writing by each such employee. The contract follows exactly what the Act requires, except for the guaranty of a minimum weekly total. That guaranty is for the protection and benefit of the employee, the needs for whose living are constant whether his weekly work is or not. It enables him to know that he will have at least the guaranteed sum to live on no matter how slack his work may prove. This helps to maintain a decent standard of living which is the main purpose of the Act. It is not forbidden by the Act. When the guaranty is made in good faith in the exercise of the right of free contract, it does not spoil the other terms of the contract and result in unintended liabilities that are inconsistent with the contract.

I am authorized to say that Judges FOSTER and HUTCHESON concur in this additional statement.

[10] In every case the amount is above the minimum.