UNITED STATES v. BENNETT (two cases).

FINCH et al. v. ARNOLD, Acting Collector of Internal Revenue et al. (two cases).

BIRKBECK v. THOMAS.

RITCHIE et al. v. THOMAS.

Nos. 13184, 13309, 13327.

United States Court of Appeals
Fifth Circuit.

Jan. 8, 1951.

Carlton Fox, Ellis N. Slack, Lester L. Gibson, Sumner M. Redstone, Special Assts. to the Atty. Gen. and Theron Lamar Caudle, Asst. Atty. Gen. and Henry W. Moursund, U. S. Atty., San Antonio, Tex., for the United States.

Muckleroy McDonnold, San Antonio, Tex., for appellees Bennett.

E. D. Treadwell, Jr., Arcadia, Fla., and Lawrence Rogers, Kissimmee, Fla., for Amicus Curiae.

Harry C. Weeks, Frank B. Appleman, Fort Worth, Tex., for appellant Finch and others.

Carlton Fox, Ellis N. Slack, Special Assts. to the Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen., Frank B. Potter, U. S. Atty., Fort Worth, Tex., O. Morris Harrell, Asst. U. S. Atty., Dallas, Tex., for appellee Arnold.

Harry C. Weeks, Frank B. Appleman, Fort Worth, Tex., for appellants Birkbeck and Ritchie.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Carlton Fox, Special Assts. to the Atty. Gen., Frank B. Potter, U. S. Atty., Fort Worth, Tex., O. Morris Harrell, Asst. U. S. Atty., Dallas, Tex., for appellee Thomas.

Before HUTCHESON, Chief Judge, and HOLMES and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

Concerned with the application of Sec. 117(j), 26 U.S.C.A. to sales of draft and work animals and of cows and bulls culled from their breeding herds, these appeals are from judgments in suits by cattle breeders for refunds of income taxes overpaid by them in the Ritchie and Bennett cases for the years 1942 and 1943, and in the Finch case for the years 1947 and 1948.

Specifically the question presented by each appeal is whether, as contended by the collector, the gains from such sales were ordinary income, or, as contended by the taxpayer, were capital gains under the section because the sales were of: "property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Sec. 117(j) (1), Title 26 U.S.C.A.

In the Bennett case, the judgment was for the taxpayer, and the collector appealed.

In the Ritchie and Finch cases, the judgment was for the collector and the taxpayers appealed.

While the undisputed facts stipulated or sworn to in each of the cases exhibit small and unsubstantial variances, in substance they are the same.

Each of the taxpayers was, in the years in question, engaged in the business not of stocking and feeding cattle for sale as beef cattle but of breeding cattle to sell the calves, and these sales constituted the main source of their income. Such sales are not in question here.

In addition, however, to making these sales, taxpayers, as a matter of regular practice and in the normal course of their breeding business, from time to time, culled from the breeding herds such of the cows and bulls as had lost their usefulness as breeders, and, without separating them from the rest of the herd or holding them for feeding and fattening, sent them, immediately after culling, to market with the regular market herd. It is the sales of these culls which are in question here.

At all the ranches the general practice was not to raise but to buy the breeder bulls. All of them, however, raised substantially all of their breeding cows, and the practice as to these was, when they were about two years old, to place the heifers deemed to be suitable for breeding in the breeding herd.

It was in evidence that while the producing life of cows and bulls in the breeding herd varied, the average life of the cows was about six to eight years, of the bulls, three.

In addition to the sales of the culled cattle, some of the ranches sold some work, or draft, horses or mules in the tax years in question.

It was generally true that the main horse herd on the ranches consisted of horses and a few mules for use of the cowboys and other employees. The brood horse herd was mainly to furnish horses for the main horse herd. The brood mares were sold when they had reached the limit of their productivity.

In the Finch case, Finch testified in answer to a direct question that he did not hold the animals in the breeding herds for sales to customers in the regular course of his cattle business, that he only sold them by culling them when their productive period was past, and this was the general effect of the testimony in the other cases.

In one of the cases, sixteen of the cows sold from the breeding herd reduced it by that much, and the collector, under the authority of I.T. 3712 C.B. 176, a departmental bulletin interpreting 117(j), treated as capital gains the gains realized from these sales.

Here, as appellant in two of the cases and appellee in another, the collector admits that the taxpayers are in compliance with the other provisions of Sec. 117(j) as set out above. He denies, however, that they are in compliance with provision (B), quoted supra. He insists that on the face of the statute, and in accordance with I.T. rulings #3660 and 3712, the cattle whose sale is in question were property held by the taxpayer "primarily for sale to customers in the ordinary course of his trade or business".

Taxpayers insist that in using the word "primarily" in the statute, the congress used it in its accepted meaning of "primus" or first and not, as the collector contends, to mean its opposite extreme, "ultimus" or last.

In support of his position that, generally speaking, gains from the sales in question are not capital gains, the collector points to I.T. 3666, declaring that "the sale of animals culled from the breeding herd as feeder or slaughter animals in the regular course of business is not to be treated as the sale of capital assets", and to I.T. 3712, defining the phrase "culled from the breeding herd" as the normal sale of those animals which, due to injury, age, or disease, or any other reason other than that of changing the breed or the quality of offspring are no longer desired by the live stock raiser for breeding purposes, and also the normal selection for sale of animals for the purpose of maintaining the herd at a regular size.

In support of his position that the gains from the sixteen sales which reduced the breeding herd, were capital gains, he relies on the declaration in the same I.T., that if the number of animals sold from the breeding herd during a taxable year exceeds the number of breeding animals added to the herd during the same year, it will be presumed that the excess number sold consisted of animals held for breeding purposes, the gain or loss from which is subject to 117(j) because "Such sales effect a reduction in the live stock raisers breeding herd".

In short, it is the collector's position that, under these rulings, calves, dropped by the

breeding herd and in normal course channelled into it, and then, after a period of service, sold, are not capital assets entitled to capital gains treatment under 117(j) unless the sales are made to reduce the breeding herd. In this connection, he concedes that where live stock is purchased to change or improve the breed, this is not considered as replacing animals sold.

On the basis of these rulings of the Income Tax Unit of the Bureau, made to order for the commissioner by his legal staff, and having no more binding or legal force than the opinion of any other lawyer,[1] the collector claims: that the statute, though intended as a relief measure, does not relieve these taxpayers; that this is so simply because it is known at the time the calf is dropped that, whether it goes to market as a calf or as a worn out breeder, to market it will go.

Thus "primarily" as used in the statute, in the view of the collector, comes, as to these breeder cows, to mean "ultimately", that is after their primary use and purpose is finished and over. The collector contends, in short, that the primary purpose of maintaining the breeding herd is to sell the animals bred; and that the fact that for many years these cattle are used as breeders is immaterial; that this is just a delaying action which postpones the time when, but does not change the fact that, they will in due course be sold.

Taxpayers approach the matter differently. They insist that the commissioner has set up a set of artificial rules for the handling of supposed facets of a question which presents but a single face, is entitled to but a single treatment. They say: that the distinction between cattle, bought solely for breeding purposes and sold to be replaced with others bought solely for such purposes, and cattle, bred and raised on the place, is as artificial and unsound, as is the distinction sought to be made between sales reducing and those not reducing, the herd; that there is nothing in the purpose of the law or its operation which requires or permits of such a construction.

They say further that, as applied to the cattle business of the kind taxpayers are engaged in, the practical and reasonable construction of the statute is that, where the business of the cattleman is stocking and feeding for purposes of sale, or where the cattle are bred to be sold as calves, none of these cattle, when sold, are entitled to 117(j) treatment because they are kept primarily for sale in the ordinary course of the cattleman's business.

They say, however, that when the business of the cattleman is to breed and sell calves and his breeding herd, though obtained from the cattle he raised, is kept and maintained for that purpose, there is no more reason to say of these cattle that they are kept primarily for sale than to say it of cattle which are bought for breeding and sold when and because their breeding uses are over.

They point out, too, that, whereas, when sold after six or eight years of use as breeders, they bring about the same as calves sold in the first and second year, by using them as breeders, they produce offspring which brings many times more. They insist, therefore, that this establishes that these cattle are kept primarily as breeders and not for sale, and that their sale, when worn out, is purely a secondary or incidental use.

As to the draft animals sold, the government makes no really serious contention that taxpayers are not entitled, as to them, to 117(j) treatment and without laboring the argument, we hold that they are.

As to the breeder cattle, we understand, but are in complete disagreement with, the collector's point that since it was known before the calves were dropped that each would certainly be sold, either while still a calf or after its usefulness as a breeder was past, it ought to be held that all of the stock bred and raised on the ranch was kept primarily for sale. We think such a severely narrow and restricted point of view wholly unreasonable, impractical and unsound.

1. Fleming v. A. H. Belo Corp., 5 Cir., 121 F.2d 207.

If the statute had been intended to mean what the collector contends for, the word "primarily" would not have been in it. Since "primarily" is in the statute, it seems clear to us that to hold, as the collector contends, that the main, the first, purpose of the keeping of these breeder cattle was for sale, does complete violence to the statute and to its purpose and intent.

The construction contended for by the taxpayers seems the more reasonable to us. It has the support of the Albright v. United States, 8 Cir., 173 F.2d 339, and of two tax cases, Emerson v. Commissioner, 12 T.C. 875; Fawn Lake Ranch Co. v. Commissioner, 12 T.C. 1139; and in principle of Delsing v. United States, 5 Cir., 1951, 186 F.2d 59.

The judgment in favor of taxpayer in the Bennett case is Affirmed. The judgments against taxpayers in the other cases are Reversed and here Rendered for the taxpayers.