## W. R. STEPHENS CO. v. COMMISSION-ER OF INTERNAL REVENUE.

### No. 14499.

United States Court of Appeals
Eighth Circuit.

Nov. 13, 1952.

Rehearing Denied Dec. 15, 1952.

Collet, J., dissented.

R. H. Fryberger, Minneapolis, Minn.,
for petitioner.

Melva M. Graney, Sp. Asst. to Atty.
Gen. (Ellis N. Slack, Acting Asst. Atty.
Gen., and A. F. Prescott and Carolyn R.
Just, Sp. Assts. to Atty. Gen., on the
brief), for respondent.

Before SANBORN, JOHNSEN and
COLLET, Circuit Judges.

SANBORN, Circuit Judge.

This is a petition to review a decision
of the Tax Court of the United States re-
determining deficiencies in the petitioner's
excess profits taxes for the years 1944 and
1945 and income tax for the year 1945.

The petitioner is a dealer in new and
used automobiles. It has a franchise from
the General Motors Corporation for the
sale of Buick automobiles. The principal
place of petitioner's business is in Minne-
apolis, Minnesota. It also has a place of
business in St. Paul. Under or by virtue
of its franchise, the petitioner in 1941 and
1942 acquired from the Buick factory or
from other Buick dealers more than three
hundred new Buick cars of the 1942 mod-
el. During the war years 1942 to 1945,
new automobiles were not being produced,
and sales of new cars of the 1942 model
were closely restricted by the Government.
During that period the petitioner was en-
gaged in dealing in used cars and gas and
electrical household appliances. It was
also a subcontractor under war contracts.
The petitioner received no new Buick cars
from the Buick factory until May 1946.

During the taxable years in suit twenty-eight 1942 Buick automobiles were being used, or were assigned for use, by the petitioner in the conduct of its business. Twenty-six of these cars had been acquired in 1941 and two in 1942. In 1944 the petitioner sold four of the twenty-eight cars. In 1945 it sold sixteen of the cars. The cars were sold at prices equal to those obtainable for new cars of the same model.

The petitioner claimed that the twenty-eight cars were property which was subject to allowance for depreciation in 1944 and 1945, under § 23(*l*) of the Internal Revenue Code, 26 U.S.C.A. § 23(*l*), which provides for "A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) —(1) of property used in the trade or business, or (2) of property held for the production of income."

The petitioner also claimed that the profits resulting from the sales of such of the cars in suit as were sold in 1944 and 1945 were long-term capital gains, and not ordinary income. This because of § 117 (j) of the Internal Revenue Code, 26 U.S.

C.A. § 117(j), which, in effect, provides that gains from sales of property used in a trade or business and held for more than six months shall be considered as long-term capital gains from sales of capital assets if the property is not held primarily for sale to customers in the ordinary course of the taxpayer's trade or business.[1]

The respondent contends, and the Tax Court found, that the cars in suit were "property held by the taxpayer primarily for sale to customers in the ordinary course of his [its] trade or business" within the meaning of § 117(j) (1), and were not subject to allowance for depreciation, and that the gains from the sales of the cars were ordinary income.

The petitioner asserts that its evidence conclusively showed that the cars in suit were not primarily held for sale to customers in the ordinary course of its business, and that the finding of the Tax Court that they were so held is clearly erroneous.

The question which concerns us is whether there is adequate evidentiary support for the finding of the Tax Court. If there is, the decision under review must be affirmed. If there is not, the case must be remanded to that Court for a redetermina-

1. "§ 117. *Capital gains and losses*

"(a) *Definitions.* As used in this chapter—

"(1) *Capital assets.* The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), * * *.

\* \* \* \* \*

"(j) *Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business*

"(1) *Definition of property used in the trade or business.* For the purposes of this subsection, the term 'property used in the trade or business' means

property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *

\* \* \* \* \*

"(2) *General rule.* If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * * *"

tion of the tax liability of the petitioner for the years in question.

In its 1944 tax return the petitioner deducted $2,457.58 as claimed depreciation on fourteen of the Buick cars in suit. This deduction was disallowed by the respondent upon the ground that the cars were held primarily for sale to customers in the ordinary course of petitioner's business. In its 1945 tax return the petitioner deducted $2,259.15 as depreciation on nineteen of the cars in suit. The respondent disallowed the deduction for the same reason it had disallowed the similar deduction claimed in the petitioner's 1944 return.

In its 1945 return the petitioner reported a long-term capital gain of $14,151.92 on the sale of sixteen of the cars in suit. The respondent ruled that gains from the sales of these cars were ordinary income, since the cars were held primarily for sale to customers.

The petitioner took no deduction for claimed depreciation on nineteen of the cars in suit in its 1941, 1942 and 1943 income tax returns. With respect to the additional nine cars asserted to be in company use on December 31, 1943, no depreciation was claimed in petitioner's returns or on its books between the dates of acquisition, 1941, (except for one car acquired March 10, 1942) and December 31, 1945. Six of these nine cars were sold between December 31, 1943, and December 31, 1945. The income from the sale of these six cars was reported by the petitioner as ordinary income, and not as capital gain. The petitioner now asserts that it was in error in so reporting the income from the sale of these cars, and that its tax liability should be adjusted accordingly.

The petitioner's system of bookkeeping was that prescribed by the General Motors Corporation for its dealers. The cars in suit were initially carried in what was known as Account No. 231, "New cars held in inventory available for sale." The cars were then transferred from that account to Account No. 230, "Company cars." As of May, 1944, fourteen of the cars were transferred to Account No. 285,

a fixed asset account. The Treasurer of the petitioner testified that this last transfer was made on the recommendation of petitioner's Auditor, J. W. Stokes Company of New York. He testified: "They said that we [petitioner] should set up depreciation on them [the cars], and to depreciate them they decided to put them in service cars. * * * Their auditors came out to St. Paul from New York, and it was during one of these audits that someone from the auditors told our Treasurer [then Mr. Grover] to transfer them [the cars], and that is the way it happened."

New cars held for sale by petitioner were financed under the "floor plan" of the General Motors Acceptance Corporation. Under this plan petitioner signed a trust receipt in which it agreed to keep the cars new and unused, and only to move them from one warehouse to another. The cars could be used for display purposes, but were not to be used on the street for demonstration purposes. They were covered only by fire insurance.

Under another plan called a "Demonstration Agreement," petitioner financed 75 per cent of the cost of a new Buick car and was then permitted to use it for any purpose. A car so financed was covered by fire, comprehensive, and collision insurance. All of the twenty-eight cars in suit were financed under "Demonstration Agreement" during 1941, except the two cars received in 1942, which were financed on the same plan.

With reference to the practice of petitioner in transferring new cars from one account to another, its Treasurer testified as follows:

"The processes by which these new cars go into the account and are transferred to another account are these. As the cars are purchased from the factory they come in on factory invoices and we automatically put them into the new car inventory. That is in account 231, and when the car is— sometimes the cars are definitely set aside for company use before they are received. We order them for specific purposes. But through our procedure

of bookkeeping they would go through the 231 account and then be transferred out to company car inventory. That would be account 230. No car under the floor plan would be in account 230. They would all be on the demonstration plan."

The petitioner's Treasurer also testified: "Cars used as demonstrator or company cars, courtesy cars, or cars for salesmen were classified with the company cars in the dealers' standard accounting system. They were not classified as dealer-owned demonstrators. They were called company cars which would include demonstrator; any car that is used for company purposes."

There were printed instructions on the back of each form of "Demonstration Agreement," reading as follows:

"Period of accommodation is not to exceed the number of months between date car is placed on demonstration and the next new model announcement.

"Dealer Release Order should be used to remit monthly payments or to pay full amount when motor vehicle is released from Demonstration Agreement."

The period between the date the car was placed on demonstration and the next new model announcement would not exceed one year under normal circumstances. Under the abnormal war conditions, the period was, of course, greatly extended, apparently until 1946.

It had always been the petitioner's practice, in connection with selling new Buick cars, to assign a number of such cars to certain of its officers and employees, mainly for use as demonstrators and courtesy cars. Courtesy cars were used for the accommodation of customers whose cars were laid up for repairs. During the years in suit, the petitioner also used some of the twenty-eight cars in suit in procuring used cars over a wide territory, the sale and servicing of household appliances, the procurement of automobile parts, and the carrying out of the defense work which had been contracted for by petitioner.

A list showing the serial numbers of the cars in suit and the persons to whom they were assigned, appears in the record. It is difficult to analyze the list, due to the uncertainty as to the significance of what appear to be pencil notations before the serial numbers of the cars. Apparently in 1945 only twelve of the cars were assigned to individual officers or employees of the petitioner, and the remainder were assigned generally as courtesy cars or for general use and replacement. The list does not designate the use to which the cars assigned to individuals were to be put. The pencil notations seem to indicate that eight of the cars were not used in 1944 and that none of the cars were assigned in that year to individual officers or employees. In any event, the list indicates that less than one-half of the cars in suit were assigned in either year to petitioner's officers and employees.

In Minnesota, if a car is to be used, the annual State license tax must be paid. If the car is not used, it is exempt from that tax. To gain the exemption, the car owner must file an affidavit of nonuse during the calendar year. In applying for a license for one of the cars in suit in January 1946, the petitioner stated: "This car has been in dead storage since March 10, 1942. Previous to that it was used on our dealer plates and for demonstration only." Eight of the cars were not licensed in 1944, and four of the eight were apparently not licensed in 1945.

The petitioner's explanation of the evidence showing that some of the cars were licensed in one year and not in another was that they were being held in reserve. "They were subject to call to be put back into service. It was the same as a plant having surplus equipment that sets it aside until needed."

There was no evidence from which it could be determined definitely to what extent any one of the twenty-eight cars had actually been used, or the specific use which had been made of it, and apparently no record of the mileage of any of the cars had been kept. While the twenty-eight cars were segregated on the petitioner's books from the other new cars ac-

quired in 1941 and 1942, and were carried on the books as company cars or in the fixed asset account, and were, to some extent not definitely ascertainable, used in petitioner's business, they were, so far as price was concerned, eventually treated as new cars for the purpose of sale. They were not service cars in any ordinary sense. During the time they were held by petitioner they were appreciating, and not depreciating, in price. It is obvious that they would, in the ordinary course of petitioner's business, be sold before later model Buick cars became available.

The Tax Court said in its opinion:

"It was not within the normal operation of petitioner's business that the automobiles in issue were retained as company cars or demonstrators beyond the year in which they were current models. Their retention for a longer period by petitioner was brought about by the restriction on the production of automobiles and also by the Regulations of the Office of Production Management and the Office of Price Administration. Use of the automobiles for purposes beyond which they were permitted by the demonstration agreement, such as service cars used by maintenance men in making service calls for repairing household equipment and using the automobiles in seeking out and purchasing parts and used cars, were not ordinary and were not sufficient to change their normal character nor to establish that they were a depreciable asset rather than stock in trade.

"Petitioner has not clearly shown wherein these automobiles were used in a manner which within the normal operation of its business shows an intent to hold the cars primarily for a purpose other than sale. In our view it is for this purpose that the automobiles were originally acquired. No feature surrounds the original purchase of these automobiles by petitioner which would distinguish them from other new automobiles purchased and held for sales. Cf. United States v. Bennett, 5 Cir., 1951, 186 F.2d 407."

■ We think the question whether the cars in suit were or were not held primarily for sale in the ordinary course of petitioner's trade or business was, under the evidence, a question of fact for the Tax Court, and not a question of law for this Court. See and compare, Helvering v. Johnson, 8 Cir., 104 F.2d 140; Tyson v. Commissioner of Internal Revenue, 8 Cir., 146 F.2d 50.

The petitioner is of the opinion that this case is ruled by Albright v. United States, 8 Cir., 173 F.2d 339, and United States v. Bennett, 5 Cir., 186 F.2d 407. In those cases it was held, in substance, that livestock acquired by a stock breeder and held for breeding purposes, and not sold until its usefulness for such purposes had passed, was not held "primarily for sale to customers in the ordinary course of his trade or business." In those cases, while it appeared that the taxpayer would eventually sell his breeding stock when it ceased to be such, it was shown that his main objective in acquiring and holding the stock was for breeding purposes and not for the purpose of sale.

■ In the instant case, the evidence shows that the petitioner held the cars in suit for two purposes: one, for use pending sale; and, the other, for the purpose of sale. The respondent ruled that the primary purpose of the petitioner in holding the cars was for sale. His ruling in that regard was presumptively correct. The burden was upon the petitioner to show that the ruling was wrong. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Commissioner v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 88 L.Ed. 171; Commissioner v. Tower, 327 U.S. 280, 286, 66 S.Ct. 532, 90 L.Ed. 670.

■ We need go no further than to say that, in our opinion, the Tax Court was not compelled to find that the cars in suit were not held primarily for the purpose of sale in the ordinary course of petitioner's business.

670

The decision of the Tax Court is affirmed.

COLLET, Circuit Judge (dissenting).

There seems to me to be no material dispute concerning the facts. Petitioner received in the usual course of its business approximately 327 new 1942 model Buick automobiles. Of that number it assigned 28 to uses which were essential to the conduct of its business and which were used in the business or held available for such use. It is not suggested or contended that 28 was an unreasonable number of cars to be assigned, in view of the magnitude and character of its business. All of the 28 cars were, in the usual practice of the business, to be ultimately sold. Petitioner claimed they were primarily held for use in the business. The Commissioner contended that since they were to be ultimately sold, they were held primarily for sale and ipso facto could not have been primarily held for use in the business. The Tax Court agreed with the Commissioner but based its acquiescence in the Commissioner's position on the ground that as a matter of fact the evidence warranted the inference that the cars were held primarily for sale. I find no basis in the evidence for that inference. Hence, in my judgment the conclusion reached by the Tax Court can be sustained only on the theory that the Commissioner urged, i. e., that since the cars were acquired for the ultimate purpose of sale they must be said to have been acquired primarily for that purpose. If that be true, then no new car may be acquired, used by a dealer in its business and later sold, without being held to have been primarily acquired for sale. But this construction of the applicable sections of the Revenue Act quoted in the majority opinion was rejected in Albright v. United States, 8 Cir., 173 F.2d 339 and United States v. Bennett, 5 Cir., 186 F.2d 407, and I think rightly so.

I reach the conclusion that this case should be governed by the principles announced in the Albright and Bennett cases.