**W. R. STEPHENS COMPANY, a corporation, Plaintiff,**

v.

**Elmer F. KELM, former District Collector of Internal Revenue, Defendant.**

**Civ. No. 5053.**

United States District Court
D. Minnesota, Fourth Division.
April 13, 1956.

G. W. Townsend, Minneapolis, Minn., for plaintiff.

Erwin A. Goldstein, Washington, D. C., Alex Dim, Asst. U. S. Atty., St. Paul, Minn., for defendant.

DEVITT, District Judge.

Plaintiff, a Minnesota automobile dealer, brings this action to obtain refund of certain taxes paid to the government for the year 1948.

In dispute is the allowability of depreciation claimed by plaintiff, and disallowed by the government, on 30 Buick automobiles allegedly used by plaintiff during the year 1948 in the conduct of its business for such purposes as customer courtesy, pickup of parts, and general business use by officers and executives. Of these 30 vehicles, 16 were sold during the tax year and capital gains treatment of such sales, sought by plaintiff and denied by the government, is likewise in dispute.

Basically, the question is one of determining whether or not these automobiles were held primarily for use in the trade or business within the meaning and intent of 26 U.S.C.A. (I.R.C.1939) §§ 23(l), 117(j) and interpretative regulations. If these vehicles were held primarily for use in the plaintiff's trade or business, then depreciation allowances should have been allowed the 30 automobiles and capital gains treatment accorded the 16 automobiles sold during the period in question. But, if they were not so held, the Commissioner of Internal Revenue was correct in disallowing depreciation and the benefits of capital gains treatment.

The government showed, in support of the Commissioner's conclusion, that this property was not held primarily for use in the trade or business, that all the cars sold, except one, were sold by new car salesmen. They were sold through regular advertising mediums. Some of them were displayed in the new car sales room. The same kind of documents was used in handling the cars and in transferring them to the eventual owners as was used in the case of brand new cars. Thus, a new car invoice was used; the manufacturer's warranty on the back of it was apparently applicable; purchasers of these cars received the same "car service contract"; those which were financed were processed with the same GMAC forms; and the same insurance provisions were made applicable. The same conditional sales contract form was used and usually referred to the cars as "new."

The pricing of these cars was computed the same as in the case of new cars, that is, by adding the different component charges together. The profit on the cars sold ranged from $663 to $1,263. The cars were sold for approximately the same amount as brand new cars; all of them were disposed of for a figure above the General Motors Corporation's recommended retail price.

The testimony showed that the decision to sell these cars was made by plaintiff's President or Vice-President and that this decision was based on the economic facts of whether holding a car longer would appreciably reduce the sale price obtainable for it.

The government urges that these facts indicate that the cars in question were treated exactly like other cars sold in the normal course of business, except that their eventual sale was delayed a time, and points to the conclusion that they were primarily held for resale and were only incidentally used in the business.

From the taxpayer's view, the evidence showed that all of these 30 cars were actually used in the business and were assigned to the various executives and subordinate managers listed in plaintiff's Exhibit 16. Some of these cars were ordered specially for the company official who subsequently used them. In 5 cases convertibles were specially ordered and used by the chief executive officers. All of the cars were allocated in the accounting system to the capital account shortly after they were received by the company, although in the first instance they were placed in the "new

car" account as required by General Motors accounting practice. All of the cars were actually employed in the production of income by executives and employees driving them to used car sales in Iowa and elsewhere, going on business trips in connection with the affiliated tire business, traveling to the automobile warehouse, to the various used-car lots, to the St. Paul office, and to the Buick Motor Company Zone Office, taking working parties of men to various of these locations, for the use of customers whose cars were being repaired, and for similar business purposes.

The examining Internal Revenue Agent permitted the expense of operating these 30 cars to be deducted in the 1948 return.

It also appeared that the company "service cars", consisting of trucks and used Chevrolets and other similar cars, were recognized by the Commissioner, for tax purposes, as being held primarily for use in the taxpayer's business.

From all of this, the taxpayer urges that the logical conclusion to be drawn is that these cars were purchased by it and held primarily for use in its business and that he should receive tax treatment accordingly, regardless of subsequent resale.

■ The decided cases are not of much assistance in guiding us here, principally because the issue is a factual one and each case must be decided on its own facts. The government urges as precedent for its view the case of W. R. Stephens Co. v. Commissioner of Internal Revenue, 8 Cir., 1952, 199 F.2d 665. That involved a similar tax dispute between the same parties for a different tax year. That case, an appeal from the Tax Court, decided that the issue presented a fact question and that the taxpayer had failed to prove that the Commissioner's adverse ruling was wrong. The plaintiff claims this decision is erroneous, but that, at all events, it deals with "demonstrator" cars, not company cars. Rollingwood Corp. v. Commissioner, 9 Cir., 1951, 190 F.2d 263, dealing with houses rather than cars, tends to support the government's position with respect to the proper interpretation to be given the term "primarily" as used in the applicable statute, 26 U.S.C.A. § 117(j).

Favorable to the plaintiff and heavily relied upon by it, is the case of Latimer-Looney Chevrolet, Inc., v. Commissioner, 1952, 19 T.C. 120. Closely paralleling the facts present in the instant controversy, Latimer-Looney was decided in favor of the taxpayer and allowed depreciation and long-term capital gains treatment of 17 Chevrolets used for various company and service purposes and disposed of by sale to the general public during the year subsequent to their production but before their sale value had substantially decreased.

But none of the cases can be dispositive of a proper interpretation of the expression "held primarily". Each court tends to place the greatest weight on the facts considered most significant under the circumstances. See S. E. C. Corp. v. United States, D.C.S.D.N.Y., 140 F.Supp. 717.

From all of the facts, largely uncontested, it is not easy to draw a reasoned conclusion as to whether the 30 cars were held primarily for use in the business or were held primarily for resale. Undoubtedly, the plaintiff had the intention to use them in the business for a while and then to sell them. He thus had two purposes in mind. What was the *primary* purpose? He *says* it was to use the cars in the business. His business judgment dictated that he needed these cars for the various purposes for which the evidence shows they were used. The cars sold had an average of 7,000 miles on them. They were used for varying periods of between 8 and 13 months for the purpose of producing income for plaintiff.

Of the 16 cars sold, 1 was a 1946 model, 11 were 1947 models and 4 were 1948 models. The four 1948 models were sold in December, 1948, presumably (although the record does not affirma-

tively show this) after the 1949 models came on the market. Thus all of the cars, at the time of their sale, were not current models.

I can appreciate that it is almost a necessity for a dealer in new cars to provide the latest models for himself and his business associates. It would be a poor showing of wares for him to drive an older model car (or worse yet a different make) when his principal business mission is to convince potential customers of the necessity of buying a new car.

Plaintiff sold 1676 new and 567 used cars in 1948. It had net sales of $6,695,000 during that year. It maintained two separate show rooms, one in St. Paul and one in Minneapolis. Plaintiff was a regional distributor for a standard brand tire in a large area surrounding the Twin Cities. To use a total of 30 cars (although not all at the same time—some were sold and replaced by others) in the business during that period appears reasonable.

Thus the issue narrows down to a point of business judgment and how can the Commissioner of Internal Revenue or the Courts displace the taxpayer's judgment with their own, except it appear the taxpayer is performing a subterfuge to evade the payment of his full tax liability. That is not apparent.

To be sure, the taxpayer made a large profit in 1948 and, strange as it may seem, it was able to sell cars which had been driven for an average of 10 months for approximately the same price at which it sold brand new cars. But that apparent legerdermain was due to the strong post-war sellers' market during the year 1948 when new cars, difficult to obtain, were at a premium. This was an unusual situation and the results flowing from it tend to becloud the basic issue.

█ The simple fact is that the taxpayer needed these cars in his business. He bought them for that purpose. He used them in his business to produce income. The fact that he later sold them at an advantageous price, and before more extended use compelled their classification in a lower price range, should not retroactively vitiate his purpose in acquiring and holding them.

If the mere fact of eventual resale were to be determinative of this dispute, it would be near impossible for automobile dealers ever to be able to qualify for depreciation and long-term capital gains treatment of automobiles used by them for business purposes, but ultimately sold to others.

█ It is my conclusion that the Commissioner was in error in denying depreciation and capital gains treatment to these 30 cars.

Issue was also joined, tried and argued in this action as to the proper depreciation on taxpayer's buildings for the year 1948. As indicated from the bench, the Court is of the view that the Commissioner was correct in disallowing the taxpayer's claimed additional depreciation for that year.

Counsel for plaintiff will please submit proposed findings, conclusions of law, order for judgment and form of judgment, after presentation of same to the attorney for the defendant.