## ALBRIGHT v. UNITED STATES.
### Clv. No. 1368.

District Court, D. Minnesota,
Third Division.
March 18, 1948.

Dennis D. Daly, of St. Paul, Minn., Allen E. Finseth, of Kenyon, Minn., and Burkhardt & Dunlap, of Plainview, Minn., for plaintiff.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., for defendant.

DONOVAN, District Judge.

Plaintiff commenced this action to recover income taxes paid by him for the years 1945 and 1946. Defendant admits the payment of the taxes, and that in due course plaintiff filed claims for refund, but denies plaintiff is entitled to a refund for the years in question. The applicable Internal Revenue Code will be referred to as the Act.

The undisputed facts disclose that income taxes paid by plaintiff for the years 1945 and 1946 on his individual income, not in excess of $10,000, were $153 and $316, respectively. The returns were prepared and filed on the cash receipts and disbursements

method of accounting. During said years and for a long time prior, plaintiff had been engaged in the business of farming in Goodhue County, Minnesota. His principal income was derived from the sale of dairy products and hogs. In his business he raised Guernsey cattle for milk cows, and each year he would sell the offspring of the herd, excepting only those picked by him for replacement purposes. He also raised Duroc hogs for breeding, and in like manner sold the offspring of the herd, excepting such as he retained for replacement purposes. Plaintiff kept a boar pig not longer than a year, and at the end of such period of time he sold the boar pig (stag), purchasing another boar pig for replacement.

Plaintiff kept a set of books, which he used while on the witness stand for the purpose of identifying the transactions with which we are here concerned. The books were not as complete as they might have been, and plaintiff had to rely on his memory of events in some instances and with reference to such matters he appeared to be sufficiently positive as to lend probative value to his recollection of affairs not a matter of bookkeeping record.

Plaintiff's testimony was in substance that in 1945 he sold six cows, ten sows and one boar pig. In 1946, he sold eight cows, two bred heifers, ten sows and one boar pig. Said property had, with the possible exception of the boar pigs, been raised by plaintiff in his regular course of business and had been held by him for a period of more than six months.

For each of the years 1945 and 1946, after taking into consideration cost and depreciation, plaintiff reported the figured gain from said sales, but included only one-half of said gain in his taxable net income. On May 26, 1947, defendant's Collector restored as part of plaintiff's taxable net income the one-half of said gain he failed to include for the years 1945 and 1946. In each case plaintiff made timely claim for refund and which defendant disallowed.

Plaintiff contends that, as one engaged in the business of farming, the property sold by him in 1945 and 1946 was "used in the trade or business" he was then carrying on, and was of such character as to be subject to allowance for depreciation provided in Section 23(*l*) of the Act, 26 U.S. C.A. Int.Rev.Code, § 23 (*l*).

It is the contention of the defendant that the normal selection for sale of livestock which, due to injury, age, disease, or for any other reason, are no longer desired by the livestock raiser for breeding purposes, and also the normal selection for sale of animals for the purpose of maintaining the herd at a regular size, are not to be treated as the sale of a capital asset as intended by Section 117(j) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 117(j).

The case has been thoroughly briefed by counsel, but no court decision on the particular issues here involved has been submitted and none has been found by the court. Hence it will be of assistance to quote somewhat fully from the Act.

"Section 117. Capital gains and losses,

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer;

\*    \*    \*    \*    \*    \*

"(b) Percentage taken into account. In the case of a taxpayer, other than a corporation, only the following percentages of

the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months.

\* \* \* \* \* \*

"(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not.

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable.

"(2) General rule. If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph:

"(A) In determining under this paragraph whether gains exceed losses, the gains and losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsections (b) and (d) shall not apply.

"(B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion."

Lacking a court authority on the controversy presented by the instant case, defendant cites and quotes extensively from regulations of the Bureau of Internal Revenue and reports of Congressional Committees with reference to the Act, and particularly in respect to Section 117(j), supra.

In the absence of a controlling court decision, a ruling, regulation or construction in connection with an applicable statute is given weight akin to force of law, and will not be ignored unless it opposes the clear import of the statutory language. Koshland v. Helvering, 298 U.S. 441, 56 S. Ct. 767, 80 L.Ed. 1268, 105 A.L.R. 756; Becker v. Anheuser-Busch, Inc., 8 Cir., 120 F.2d 403. A finding by the Commissioner of Internal Revenue is presumptively correct and in a case such as the instant one, the plaintiff has the burden of proof. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Hess v. United States, D.C., 74 F.Supp. 135.

Plaintiff argues that I. T. 3666, issued by the Treasury Department in 1944, is in conflict with the literal meaning of the Act as amended. If such is the case, it would be of no help for the reason that there is no power to amend by regulations an Act of Congress that is clear and unambiguous. Koshland v. Helvering, supra.

With the applicable statutes before us, let us review said I. T. 3666 (See Internal Revenue Cumulative Bulletin 1944, page 270) as pertinent to the facts of the present case.

"Section 29.22(a)-7 of Regulations 111, relating to the gross income of farmers, provides that a farmer reporting on the

cash receipts and disbursements basis shall include in gross income the amount received from the sale of livestock raised, whereas, in the case of livestock purchased, the amount to be included in gross income is the profit determined by reference to cost less any depreciation allowable. That language might be taken to imply that livestock raised is not under any circumstances to be treated as property used in the trade or business of a character subject to depreciation. However, properly construed, the regulations merely recognize the practical difficulties encountered by the farmer in segregating his various costs and permit him to deduct currently the cost of raising live stock, irrespective of the use to which such live stock is to be put, instead of capitalizing such cost. (See sec. 29.23(a)-11 of Regulations 111.) Having already deducted the cost of raising the live stock, it would, of course, follow that in the case of the sale of such live stock, the sale price would not be offset by any amount representing cost. It will also be noted that the regulations provide that in the case of a farmer reporting on the accrual basis (in which an inventory is used to determine profits), all live stock raised or purchased for sale shall be included in the inventory, whereas live stock acquired for draft, breeding, or dairy purposes may be either included in the inventory or treated as capital assets subject to depreciation.

"The above-cited provisions of the regulations and the practice thereunder do not serve to alter the inherent character of live stock used for draft, breeding, or dairy purposes as capital assets subject to the allowance for depreciation, irrespective of whether the farmer has adopted the practice of capitalizing such live stock. The fact that such live stock may be permitted under the regulations to be included in the taxpayer's inventory for the convenience of accounting does not render such live stock 'property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year' so as to deprive the farmer of the benefits of section 117(a) or section 117(j) of the Internal Revenue Code."

\*　　\*　　\*　　\*　　\*　　\*

"In view of the foregoing, it is held that any live stock used for draft, breeding, or dairy purposes, irrespective of whether such live stock was raised or otherwise acquired, is property used in the trade or business, of a character which is subject to the allowance for depreciation, within the meaning of section 117(j) of the Internal Revenue Code, supra, provided it is held for more than six months. This is equally true whether the farmer keeps his books and files his returns upon the cash receipts and disbursements basis or upon the accrual basis.

"The sale of animals culled from the breeding herd as feeder or slaughter animals in the regular course of business is not to be treated as the sale of a capital asset."

In 1945, the Treasury Department issued I. T. 3712 (see 1945 Cumulative Bulletin, page 176), providing, among other things, as follows:

"I. T. 3666, supra, provides that the sale of animals culled from the breeding herd as feeder or slaughter animals in the regular course of business is not to be treated as the sale of a capital asset. The phrase 'culled from the breeding herd' refers to the normal selection for sale of those animals which, due to injury, age, disease, or for any other reason (other than that of changing the breed or the quality of the offspring) are no longer desired by the livestock raiser for breeding purposes, and also the normal selection for sale of animals for the purpose of maintaining the herd at a regular size. The primary factor is normal practice in the case of the particular taxpayer involved.

"Since in many cases it will be found impractical to determine accurately the number of animals sold from the breeding herd, the following prima facie test is provided for the guidance of livestock raisers. If the number of animals sold from the breeding herd during a taxable year exceeds the number of raised animals added to the breeding herd during the same year, it will be presumed that the excess number sold consisted of animals held for breeding purposes, the gain or loss from which (if held for more than six months) is subject to the

provisions of section 117(j) of the Code. Such sales effect a reduction in the livestock raiser's breeding herd. For the purpose of the foregoing test, livestock purchased for the herd to improve its quality or change its breeding shall not be considered as replacing animals sold. However, the livestock raiser who normally sells all of his cattle's offspring and maintains his breeding herd through purchases shall be considered, for purposes of the foregoing test, as maintaining his herd with animals raised by him. If animals which were held for breeding purposes and were sold can not be identified, it will be presumed that the resulting number of the highest priced animals sold were breeding animals and the balance 'culls'. If the number of raised animals added to the herd is greater than the number of such animals found unfit for breeding purposes and sold during the year, none of the animals sold will be considered capital assets subject to the provisions of section 117(j) of the Code.

"The determination of whether an animal sold was 'held for breeding purposes' or was a 'cull' shall be made from the point of view of the seller, and it shall in no case be affected by the purpose to which the animal is put by the purchaser. Thus, if a livestock raiser reduces his herd by abnormal sales of breeding animals, it makes no difference whether they are purchased by another livestock raiser for breeding purposes or by a packer for slaughter. Similarly, if a livestock raiser of registered animals sells his normal production of animals to another livestock raiser who uses them for breeding purposes, they are considered his ordinary product and the gains resulting therefrom are ordinary income not subject to section 117(j) of the Code. However, gains and losses from abnormal sales from such a livestock raiser's own breeding herd held for more than six months are subject to section 117(j) of the Code. The reasons of the livestock raiser for making abnormal sales of breeding animals held for more than six months are immaterial, and the provisions of section 117(j) of the Code apply whether the animals are sold because of drought, economic circumstances, or for any other cause.

"Immature animals which have been retained by a livestock raiser for breeding purposes shall be considered a part of the breeding herd. Gains and losses from normal sales of such immature animals, however, in accordance with the foregoing principles, are not subject to the provisions of section 117(j) of the Code."

On August 4, 1947, the Treasury Department made a special ruling pertinent to the facts of the case at bar (see Commerce Clearing House Tax Service, 1948, paragraph 6091), which reads in part as follows:

"Representatives from this office, the Chief Counsel's office, and from the Treasury Department were called before the Ways and Means Committee of the House of Representatives to discuss the question of capital gain on the sale of cattle, particularly sales from a dairy herd.

"A Representative from Minnesota stated that deputy collectors in his district are waging an intensive campaign against the farmers and asserting deficiencies in tax in a large number of cases due to adjustments which convert claimed capital gains into ordinary income.

"No specific cases were presented but the discussion was directed principally at the Bureau's position of considering the sale of 'culls' as ordinary income. In this connection the departmental representatives indicated that the Bureau would maintain such position, but it was conceded that the determination of what should be classed as 'culls' is difficult and depends upon the peculiar facts in each case.

"The prima facie presumption that sales made from the breeding or dairy herd which do not reduce the size of the herd because of addition of raised animals result in ordinary income is always subject to rebuttal and should not be applied arbitrarily. The classification of 'culls' was intended to include all animals sold from the breeding herds that represent regular sales made from such source in the ordinary operation of the taxpayer's business.

"Where the sale of prime stock was not a regular practice of the taxpayer and unusual sales were made due to exceptional demands or prices, careful consideration

should be given as to whether such sales qualify as sales made to customers in the ordinary course of business. For example, if a taxpayer regularly sold ten cows a year from his breeding or milk herd and regularly added ten or more heifers to the herd and, due to high prices during the war and the unusual demand for milk cows, sold twenty or thirty cows and added a corresponding number of heifers to the herd he should not be deprived of the right of treating such excess sales as subject to the capital gain treatment.

"Deputy Collectors in the Minnesota income tax collection district have been advised relative to the above in order that they may be careful, in the adjustment of returns, to exercise fair judgment regarding the classification of animals, in reviewing the adjudgments already made, and in considering claims for refund."

Is the Act so clear and unambiguous as to make the foregoing regulations and rulings, and the denial of the refunds in the instant case, contrary to the applicable sections of the Act?

It is an established rule of law that with few exceptions the provisions of tax levying statutes should not be extended beyond the clear import of the language used. Gould v. Gould, 245 U.S. 151, 38 S. Ct. 53, 62 L.Ed. 211; Crooks v. Harrelson, 282 U.S. 55, 51 S.Ct. 49, 75 L.Ed. 156; United States v. Merriam, 263 U.S. 179, 44 S. Ct. 69, 68 L.Ed. 240, 29 A.L.R. 1547. There are, as indicated, exceptions to the rule, such as where compliance therewith would lead to a result at variance with the policy of the legislation as a whole, in which event inquiry into the statute's antecedent history may be made to give effect to its design and purpose, "sacrificing, if necessary, the literal meaning in order that the purpose may not fail". Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67, 67 L.Ed. 199. If the language is clear, it is conclusive. There can be no construction, where the literal meaning is so obvious, that there is nothing to construe. The words of the statute may appear entirely clear on superficial inspection, but nonetheless ambiguities may exist that require construction when the language used is compared with the facts that give

rise to the issues as presented here. Helvering v. New York Trust Company, 292 U. S. 455, 54 S.Ct. 806, 78 L.Ed. 1361.

In the interpretation of statutes, it is the duty of the Court to construe the language: " * * * to give effect to the intent of Congress. * * * Often these words [of the statute] are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. * * * A fews words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, 'excepting as a different purpose is plainly shown.'" United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345.

We are here dealing with a question, not entirely free from doubt, involving the question as to whether the livestock sold by plaintiff was limited to property used by him in the trade or business at the time of the sale. Plaintiff contends the property need not be in actual use at the time of the sale in order to come within the provisions of said Section 117(j) inasmuch as it has not been converted to some other purpose. The Treasury Department has ruled the contrary. As I view it, the question is a close one. The words of the Act are " * * * recognized gains upon sales * * * of property *used in the trade or business*". The records kept and produced by plaintiff at trial, aided by his memory, present a factual problem, both technical and involved. The formula relied on by plaintiff is not free from ambiguity. The regulations and rulings of the Treasury Department in an attempt to clarify said Section 117(j), together with its legislative history as outlined in Internal Revenue Cumulative Bulletin, 1942, pages 415, 545 and 594, indicate the section relied upon by plaintiff is not as clear as might be wished for. As said by the Court in Helvering v. Wilshire Oil Co., 308 U.S. 90, at page 103, 60 S.Ct. 18, at page 25, 84 L.Ed. 101: "The Congress itself, as revealed in the history of the revenue acts, has expressed varying

philosophies. In practical administration of any one statute there are admittedly borderline cases between deductible business expenses and non-deductible capital outlays. On specific fact situations the clear line between depletion, depreciation, and obsolescence often becomes blurred. What those lines are or should be is for the Congress and the Commissioner."

Such is the situation in the present case. I conclude plaintiff has not carried the burden of proof required of him in connection with a tax statute to overcome what the Court in Becker v. Anheuser-Busch, Inc., supra, describes as: "[regulations prescribed therefor having] the force of law, and when as here the statute does not descend to minutiae, but has been reenacted in view of the regulations, the interpretation by officials charged with administration may not be disturbed except for weighty reasons." [120 F.2d 403, 413].

The record of the case at bar does not permit the Court to nullify the pertinent Regulations and rulings relied upon.

Defendant may present findings of fact, conclusions of law and order, together with appropriate form of judgment.

Plaintiff may have an exception.