### MILLER et al. v. UNITED STATES.
#### Civ. A. No. 14–50.

United States District Court
D. Nebraska, Lincoln Division.
Feb. 19, 1951.

Philip M. Aitken, Woods, Aitken & Aitken, of Lincoln, Neb., for the plaintiffs.

John A. Rees, of Washington, D. C., and Joseph T. Votava, U. S. Atty., of Omaha, Neb., for the defendant.

DELEHANT, District Judge.

The plaintiffs, as the sole legatees of Freeman P. Mills, deceased, who died December 30, 1946, and as successors to him and to the personal representatives of his estate seek in this action to recover the sum of $5,344.03[1] with interest, as the aggregate amount of additional income taxes asserted wrongfully to have been assessed, paid and collected during the period of the administration of the estate in respect of the decedent's income for the several years 1945 and 1946.

Without unnecessary enumeration, it may be observed that the conditions for such suit prescribed by Title 26 U.S.C. § 3772 have been met. And jurisdiction is claimed, conceded, and exists under Title 28 U.S.C. § 1346.

Essentially the question is whether the profits derived from the sale by Freeman P. Mills during the several years 1945 and 1946 of sundry cows, heifers and bulls were taxable, in the manner of his and his estate's returns, as long term capital gains, or, in the manner of the defendant's insistence, as ordinary income. If, and to the extent that, the former alternative is accepted, the plaintiffs must prevail; otherwise, they may not recover.

The complaint[2] sets out in detail (which for present purposes need not be carried into this memorandum) the making of the taxpayer's returns for the several years, the assessment and payment of additional taxes based upon the defendant's theory of the taxable character of the profits now involved, and the presentation of claims for refunds, upon the basis of which (after elimination of the unrecoverable item of $252.89 identified in footnote 1) recovery is sought for alleged excessive payments in respect of (a) the tax for 1945 in the sum of $2,278.88, paid as of September 17, 1948, (date corrected to correspond to stipulation) and (b) the tax for 1946 in the sum of $3,065.15, of which $117.64 was paid as of March 11, 1947 and $2,947.51 as of September 17, 1948. Answering the plaintiffs' claim for recovery of the foregoing items, the defendant admits the making of the returns and the assessments and payments of additional taxes and the presentation of claims for refunds, but, by appropriate denials, reflects its persisting position in reliance on which the additional taxes were assessed, namely, that all of the profits arising from the sales of the animals above mentioned were taxable as ordinary income, and prays for the dismissal of the action.

The case has been tried upon its merits and has been submitted to the court upon (a) a written stipulation which has been made a part of the files of the case; (b) a short oral stipulation dictated by counsel at the opening of the trial and then allowed by the court; and (c) the testimony of two witnesses supplemented by two exhibits which were received in evidence. Counsel have submitted typewritten briefs in support of their respective positions[3];

1. The prayer of the complaint was for $5,596.92 with interest. However, in pretrial conference it was agreed that, in consequence of the statute of limitations, recovery could not be had of $252.89 alleged to have been mistakenly and excessively paid by the decedent with the return voluntarily made by him for the year 1945. Of the amount now claimed

$117.64 represents an alleged overpayment made with the original return for 1946.

2. Inexactly entitled "petition".

3. On this occasion the court delivers the briefs to the clerk, not for formal filing in the action but for preservation with the files in the event that reference to

and the action is before the court for final ruling.

By way of the announcement of its factual findings, the court first declares that it adopts and finds to be true the facts formally stipulated by the parties in the instrument filed October 11, 1950 (filing 4). They will neither be repeated in detail nor summarized, beyond the statement that they cover adequately, the Nebraska citizenship of the plaintiffs; the making to the Collector of Internal Revenue for the District of Nebraska of returns for taxation in respect of the income of Freeman P. Mills for the several years 1945 and 1946; the payment with each return of the tax computed and returned therein; the assessments thereafter for the several years of the items of additional tax alleged and the payment of such items; the filing with the collector more than six months prior to the institution of this action of claims for refund in respect of the amounts in suit; the absence of action by the Commissioner of Internal Revenue on such claims; and the plaintiffs' succession to the rights in the premises of the original taxpayer for each year.

Before the introduction of oral testimony, it was stipulated between counsel, with formal allowance by the court, that: "in the event that this court finds that the gains from the sales of cows, heifers and bulls sold by the taxpayer during the years 1945 and 1946 are to be treated as capital gains for income-tax purposes, then the plaintiff is entitled to recover the amount sued for, as that amount has been amended by the stipulation and amendment agreed on in the pretrial conference" (see footnote 1).

Immediately before the dictation of that stipulation counsel for the several parties orally made opening statements which were stenographically reported by the

them may be desired. They include a trial brief in behalf of the plaintiffs, defendant's memorandum brief, a letter by way of a reply brief written by counsel for the plaintiffs to the trial judge on January 25, 1951 of which a copy was transmitted to counsel for the defendant, and defendant's supplemental brief.

official court reporter, of whose notes, presently available, an informal transcript has been made for the advice of the court in the present ruling.

Further facts established by the evidence and now found by the court are these. Freeman P. Mills was a Western Nebraska cattle rancher and operated two ranches in extent aggregating 20,000 acres in the vicinity of Gordon, Nebraska. In one of those operations from 1941 to and through 1946 he was in partnership with his son, Milbourne W. Mills, who in the former year had succeeded to the interests of another partner of his father in that operation. In the other ranch operation, Freeman P. Mills had had a partner until about 1942 when the association was dissolved by a division of the cattle, with Mills remaining individually in the operation. Thereafter and until his death he conducted his operation of that ranch with a view to the rebuilding to its capacity of the cattle herd on it.

The elder Mills' business was the breeding and raising of Hereford beef cattle. He operated generally in the following manner. On the several ranches he kept a large number of Hereford cows [4] for the production of calves. These cows were raised by him on the ranches. As sires, he used no animals of his own raising, but rather purchased as they were required registered young Hereford bulls which were used for not more than three or four years, when, from considerations of efficiency and the avoidance of inbreeding, they were sold on the general livestock market. Each year in the early part of April, calves were born in large number. Of these the males were promptly castrated and, after being kept and grazed as young steers for a period of time considered to be to the greatest financial advantage of their owner, were sold on the market.[5] The

4. These were not registered as pure bred animals.

5. The age at which steers were generally sold does not clearly appear from the record and is actually not material.

females so born were retained without incident until they were approximately fourteen months old, when they were introduced, along with the cows and any retained heifers over two years old [6], into the breeding herd, placed in pastures with bulls and thus exposed to the incident of pregnancy. As a matter of practical experience, of bovine females thus circumstanced, some eighty or eighty-five percent conceive, carry through the nine and one-half month gestation period, and deliver, calves. In the late autumn of each year Mills made an analysis of his breeding herd and from it retained in such number as to him seemed prudent the more desirable and promising units and sold the others on the general cattle market. In 1945 and 1946 he retained sufficient units to accomplish a steady increase in his herd towards his goal of the full and adequate stocking of the ranch which he was then operating alone. In this process he culled out the less satisfactory of his cows, those that were getting old and nearing the end of their reproductive period, some with unsatisfactory breeding records, and such others as had encountered physical blemishes or disabilities, rendering them unsuitable for the herd without disqualifying them for the market. He also eliminated those bulls which were unsatisfactory for his herd by reason of their period of service or otherwise. Of the heifers, those less likely as breeders were removed from the herd, both of those two years and more old and of those between one and two years of age. The animals thus eliminated, cows, bulls, and heifers, were sold on the general cattle market, and from the exhibits before the court it appears that in 1945 and 1946 such sales were made in the last week of October or in November.

Eliminating sales of steers which are not involved in the present submission, the following table discloses Mills' entire cattel inventories on January 1, of 1945 and 1946, as also on December 31, 1946 [7], and his total sales of heifers, cows and bulls in 1945 and 1946.

| Inventory Jan. 1, '45 | | 1945 Sales | Inventory Jan. 1, '46 | 1946 Sales | Inventory Dec. 31, '46 |
|---|---|---|---|---|---|
| Heifers | 90 | 166 | 132 | 101 | 117 |
| Cows | 394 | 31 | 432 | 97 | 436 |
| Bulls | 30 | 9 | 26 | 6 | 29 |
| Calves | 435 | — | 421 | — | 451 |
| Steers | 0 | — | 30(yearling) | — | 83(yearling) |

Of the heifers sold in 1945, thirty-eight were obviously over two years old, and, therefore, were taken from the heifers on hand, rather than the calves listed, at the beginning of that year, leaving one hundred twenty-six of those sold as coming from the latter source. Similarly, in 1946, seven heifers sold were clearly from the more than two year old group, leaving ninety-four sold as coming from the calves on hand on January 1, 1946.[8]

From the foregoing table, counsel for the government in his reply brief undertakes unconvincingly to argue respecting

6. These being females which had passed through the previous year's breeding period without encountering pregnancy and had not been sold in the ensuing autumn.

7. The end of the period involved and the day following his death.

8. This conclusion is gathered from the weights of the heifers sold and from the oral testimony touching the weights of heifers at certain ages and the possibility of reaching a reliable conclusion touching the age of a heifer from her weight.

The court is quite aware that in Exhibits 2 and 3 there are footnotes classifying the thirty-eight and seven heavier animals as "cows". But those exhibits were prepared by an accountant, not a cattleman. And the evidence elsewhere makes it clear that a female sold as a cow has had a calf, and one sold as a heifer has not. So, the accountant to the contrary notwithstanding, the court has to conclude that the heavier animals sold as heifers were actually heifers, but of the older group.

952

the exact numbers of heifers born each year, and the numbers of them placed in the breeding herd and the disposition of the others. But, obviously, such exactness is unattainable. The total number of calves born in any year is not shown except by estimate and comparison with the year-end inventories. The proportion of males to females born, while said to be approximately one to one, is ascertainable only as an estimate. The number of heifers that died and the number, if any, killed for beef on the ranches is neither shown nor estimated. So, at best, only informed guesses may be made respecting those items.

In the sale on the market of heifers after they have been put into a breeding herd and exposed to the service of bulls, the seller has to suffer a "dock" or reduction in price, in recognition of the probability of their pregnancy, in comparison with the price they would command as "open" or unbred heifers.

In the income tax reporting for 1945, Mills, and for 1946, the representatives of his estate, accounted for the profits from the sale of steers as ordinary income and paid tax thereon accordingly. That portion of the income and the tax thereon are not in controversy. But the profits from the sales of the cows, bulls and heifers were by the taxpayers reported as capital gains and taxes on them were paid upon that basis. In total disagreement by the Bureau of Internal Revenue with that premise, the additional tax was assessed and collected.

All tax reporting was done and all payments were made on the cash receipts and disbursements basis rather than on the accrual basis.

■ The statutory language involved is found in Title 26 U.S.C. § 117(a)(1) and j(1) and is quoted in a footnote.[9] The matter for decision is whether the sale of cows, bulls and heifers which occurred in this instance was the sale of a capital asset within the definition of the quoted statute, the burden of proving which rests on the plaintiffs.

If there were no instructive decisions upon the subject, this court would be inclined towards the view for which the defendant contends, which is reflected in the opinion in Albright v. United States, D.C.Minn., 76 F.Supp. 532, but see reversal in Albright v. United States, 8 Cir., 173 F.2d 339, and in the short dissent from the reversal of that case on appeal. The reasons for that inclination need not be

9. "§ 117. Capital gains and losses
  "(a) Definitions. As used in this chapter—
  "(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer;
  *      *      *      *      *      *
  "(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.
  "(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable."

declared, for they seem quite decisively to have been rejected. But, upon the basis of the relative uniformity of the reported opinions dealing with the subject in any respect that thus far have been allowed to achieve finality, the present ruling must be for the plaintiffs.

In Albright v. United States, 8 Cir., 173 F.2d 339, 342, reversing D.C., 76 F.Supp. 532, 538, the Court of Appeals for this circuit held that the profit resulting from the sales in two consecutive years of cows and bulls from a dairy herd, *and in one of those years, of two bred heifers;* see 76 F.Supp. 538, second full paragraph on page 533, was a capital gain and so taxable.[10] In its discussion the court proposed the following test of the applicability of Section 117(j)(1) of Title 26 U.S.C. "In order for the taxpayer to come within the provisions of section 117(j) permitting him to treat the sales from his dairy and breeding herds as sales of capital assets, the burden is upon him to show: (1) that the animals sold were used in his trade or business; (2) were subject to allowance for depreciation; (3) were held for more than six months; (4) were not property of the kind includible in the inventory of the taxpayer if on hand at the close of the taxable year; and (5) that the animals were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *"

Then, observing that the first four quoted requirements were concededly met in the case before it, the court proceeded to hold that the cattle whose sale was there involved were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, and, thus that the fifth and final requirement had been proved.

In the present case the first four items in the suggested test are not expressly or formally conceded, although, actually no real adverse emphasis was offered concerning any of them until the service of the defendant's reply or supplemental brief.[11] Prior to that time the emphasis of the defendant was upon its point that all of the cattle involved in this case with the sole possible exception of the bulls sold were actually held by the decedent primarily for sale to customers in the course of his business, and that in that respect cows, heifers and bulls in a western Nebraska cattle breeding herd are to be distinguished from similar items in a dairy herd whose primary and ordinary sales to customers are of milk and its products.

But in reaching its conclusion in the Albright case the Court of Appeals adverted to and examined certain interpretations of Title 26 U.S.C. § 117(j) found in (a) I.T. 3666, 1944 Cumulative Bulletin 270, (b) I.T. 3712, 1945 Cumulative Bulletin 176, and (c) a letter of the Commissioner to a member of the United States Senate dated August 4, 1947, explanatory of the foregoing rulings. Without repetitious quotation from or discussion of those items, it is now noted that in the one first cited appears the following pertinent ruling: " * * * it is held that any livestock used for draft, breeding, or dairy purposes, irrespective of whether such livestock was raised or otherwise acquired, is property used in the trade or business, of a character which is subject to the allowance for depreciation, within the meaning of section 117(j) of the Internal Revenue Code, provided it is held for more than six months. This is equally true whether the farmer keeps his books and files his returns upon the cash receipts and disbursements basis or upon the accrual basis." That material is followed in the ruling in the bulletin by a declaration that the sale of animals culled from a breeding herd

---

10. Noticed but regarded as hardly instructive (except in reference to sales of bulls) is the ruling to the same general effect in the cited case upon the classification of the profit from the sale of a breeding herd of hogs. It rests heavily on the testimony regarding the rather unusual local usage of selling each year the entire breeding hog herd.

11. The indicated reorientation of position—in fact the service of the later brief—was obviously prompted by the intervening ruling in United States v. Bennett, 5 Cir., 186 F.2d 407, whose early submission and decision counsel and the trial judge had in view at the time of trial herein.

as feeder or slaughter animals is not to be treated as a sale of capital assets. With the latter conclusion as well as comparable material in the Bureau's further rulings cited, supra, the Court of Appeals disagreed, although it appears to have approved and followed the construction and application reflected in the quotation just made herein.[12]

Regard being had to the manner of submission and initial briefing of the case now under consideration and to the prevailing thought of Albright v. United States, 8 Cir., 173 F.2d 339, this court unhesitatingly holds (1) that the animals sold were used in the taxpayer's trade or business, (2) were subject to allowance for depreciation, (3) were held for more than six months, and (4) were not property of the kind includible in his inventory if on hand at the close of the taxable year. And upon the only question really and substantially litigated before the court, it also finds and holds, (5) that the animals were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

At the time of the trial of this action, the Albright case was the only conceivably pertinent one in which a Court of Appeals decision had been made. And the possibility of its distinction on the already suggested ground of the disparity between the dairy business and stock growing ranch business was emphasized by counsel for the defendant and kept in view by the court.

However, following the thought reflected in the Albright opinion, the Tax Court before this trial had applied the view of the Albright opinion to comparable sales from ranch herds used for the breeding of beef cattle. Fawn Lake Ranch Co. v. Commissioner, 12 T.C. 1139; Flato v. Commissioner, 14 T.C. 1241. It had also made like rulings in certain memorandum decisions. The same court had made like application in another dairy herd case. Emerson v. Commission, 12 T.C. 875. Of those cases the defendant asserted that they arose in the area of the eighth circuit and merely followed the Albright opinion from considerations rooted in the potential reviewing jurisdiction. Obviously, that is not true of the Flato case. The Emerson case involved the sale of cows and bulls—not bred heifers—from the cattle breeding herd. And it does not appear that any sales of heifers were involved in the Flato case. But in the Fawn Lake Ranch case the status of heifers once placed in the breeding herd was considered; and they were held from that time forward not to have been kept primarily for sale to customers and on their sale at a profit, along with cows and bulls, to involve a capital gain. To be sure, that case presented many differences from the present one. Among them may be mentioned the corporate character of the taxpayer; its tax reporting on an accrual basis; its maintenance of detailed and exact records in respect of each animal owned by it, with regular and systematic accounting for appreciation on young animals as they developed; its sale of a large proportion of its young heifers without their introduction to the breeding herd and the payment of tax on the profit from that transaction as an ordinary income;[13] its exact identification on its books of heifers transferred from the general inventory to the breeding stock inventory; and its apparent deferment until they had passed their second birthdays of the introduction of heifers into the breeding herd. But none of those differences, nor all of them in combination involve any essential factual distinction from the case now before the court.

---

12. In its reasoning the Court of Appeals proceeded in full recognition of the rule that "the administrative interpretations of an ambiguous statute by those in charge of its administration and enforcement are to be given great weight by the courts." See 173 F.2d at page 345. This court, it may appropriately be said, proceeds upon the same ground rather than with the more critical attitude asserted by the writer of the opinion in United States v. Bennett, 5 Cir., 186 F.2d 407.

13. Such a result would have occurred in this case if any of the Mills heifers had been sold without first entering the breeding group. But no such transaction occurred.

Finally, the three cases which entered into the ruling in United States v. Bennett, 5 Cir., 186 F.2d 407 had been passed upon with divergent results in the several district courts in which they arose. In two of them the government had prevailed, in the other the taxpayers. Counsel discussed them in their briefs, the defendant's attorney even asserting that "The issue here is precisely the same as that in the Finch and Birbeck cases which support the defendant and also the Bennett case, contra." [14]

On January 8, 1951 the Court of Appeals, Fifth Circuit, 186 F.2d 407, decided the appeals in the three cases last noted, holding for the taxpayers, upon the authority of the Albright, Emerson and Fawn Lake Ranch cases. In that action, it rejected the thought restricting the reasoning of the Albright case to the sale of units of the breeding stock of a dairy herd and affirmed its extension to the sales of breeding cattle on ranches comparable to those owned by Mills. Of course, the right to seek review of the ruling by certiorari still exists.

The decision of the Court of Appeals upon the cases just mentioned prompted the defendant's supplemental brief in which the fifth circuit's opinion was put aside as offering no additional persuasive authority, and an attempt was made to demonstrate that in the state of the record and evidence all of the animals presently involved, and especially the heifers, were outside all of the five numbered tests proposed in the Albright case, except ownership for more than six months. Without unnecessary discussion those contentions are now rejected as invalid. That brief also cites and submits a copy of the recent opinion of the Tax Court in Kline v. Commissioner, 15 T.C. 998. But that opinion is not instructive. It dealt with a peculiar practice under which the taxpayers, engaged chiefly in cattle feeding [15] in Kansas, each year for several years, bought from Texas ranches a large number of eight year old cows, practically at the end of their profitably reproductive period, of which most were bred before purchase, but some were bred to bulls owned by the taxpayers after their acquisition, kept them through their calving period and then turned them into their feeding lots, fed them and marketed them as beef animals. The profit thus arising was regarded by the tax court as ordinary income because in the circumstances the cows were held primarily for sale to customers in the taxpayers' regular feeding business and were not subject to depreciation allowances. Emphasis was placed upon the natural articulation of the examined operation into the taxpayers' principal business,[16] and their dealing with the old cows was distinguished from the hog operation in the Albright case on the ground that in the Albright case the evidence disclosed that the annual liquidation of the hog breeding herd was a regularly accepted practice in the raising of pigs in the community involved, whereas clearly the acquisition of old cows and their sale after a single calving season was and is extraordinary in a cattle breeding business and naturally accommodated to a feeding project. In the supplemental brief counsel also cites Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286. It is impossible to perceive in it any bearing upon the instant problem.

A recent opinion from a District Court within this circuit is Lewis v. United States, D.C.W.D.S.D.[1] In it the rule in the Albright case was applied to a beef breeding herd. However, in the South Dakota case the taxpayer's practice apparently was to sell most of his heifer calves "at an early

14. A position regarding which he appears to have come by some doubt in the interval between the preparation of his initial brief and the delivery of his supplemental brief.

15. They also raised some beef cattle, an operation which was not involved in the reported opinion.

16. That is, so far as the cattle industry is concerned. In truth, that activity was a collateral occupation for both of the Klines, one of whom is a prominent Topeka attorney at law, and the other a Kansas City insurance dealer.

956

age", retaining only a few of them for later introduction into his breeding herd. And the sales examined were only of cows and bulls.

Under the counsel of the reported—and final—opinions thus far rendered, and the fifth circuit's possibly reviewable expression, this court feels compelled to award to the plaintiffs judgment as prayed by them. Concerning the basis of taxation of profits from the sale of cows and bulls there can be no doubt, unless all pertinent authority is to be rejected. Nor, it would seem, is the situation less certain with respect to the sale of heifers two years and more of age, that is, after their second period of inclusion in the breeding pastures.

Greater doubt may be acknowledged touching the heifers sold when they are eighteen or nineteen months old and in the late fall after their initial exposure to pregnancy. Unquestionably a proportionately large number of Mills' heifers born each year were sold in the following year in those circumstances, and such sales must have been anticipated as probable (but without identification of the units to be sold) when the animals were born as calves. On the other hand, no heifer was sold in either year which had not spent several months in the breeding herd, which seems to have been Mills' method of taking decisive action in their classification as breeders. All of them were thereby made subject to "dock" for pregnancy and for their removal from the superior classification of "open heifers". All of them had been for a substantial time members of the breeding herd, from which none of them were removed except by a process of selection or culling and on the basis of their inferiority in comparison with heifers of like age with them in the breeding stock. These factors, and Mills' entire method of operation move the court, the authorities being regarded, to treat the heifers sold as part of the breeding herd, with the consequence indicated.

The reference to the authorities prompts a possibly pardonable repetition. Two bred heifers were included in the sales involved in the Albright case, and an undisclosed number in the Fawn Lake Ranch case. While the opinion in United States v. Bennett, supra, does not describe exactly the animals whose sale was involved in it, available material leads the writer of this memorandum to the reasonably supported inference that in at least one of the cases disposed of in that ruling a substantial number of heifers, once introduced into the breeding herd, were among the cattle sold, the status of whose sales was ruled upon. To these observations regarding the sales of heifers reflected in certain of the reported opinions must be added the general thought of all of the cited cases.

And this may be suggested finally. In the light of the manner in which the assessment of the additional tax sued for was made and its collection effected, in which the pleadings in the present case stand, in which the dictated stipulation opening the trial was made and the trial had and the initial briefs submitted, it may be reasonably doubted whether the parties have presented an appropriate case for a decision partly in the plaintiffs' favor and partly for the defendant. Beyond what has already been suggested upon the point, the tax reports and documents supplemental thereto are not before the court as a basis for the recomputation of income and taxes. And it seems quite clear from the stipulation that no such course was contemplated and that the plaintiffs made their further proofs under that well founded impression. What is said in this paragraph is not a factor persuasive in the decision announced. If the court were convinced that, through some misapprehension, the proofs were allowed to be incomplete the case would be reopened for the reception of further testimony. That is not the situation.

Judgment is, therefore, being entered in favor of the plaintiffs for the amount prayed for, with provisions touching interest conformable to Title 26 U.S.C. § 3771 and Title 28 U.S.C. § 2411. It is recognized that neither the written stipulation in the case nor the oral evidence may

1. No opinion for publication.

be regarded as instructively pertinent to the minor item of $117.64 alleged to have been paid excessively with the original return for 1946. The court is not given to understand upon what ground the overpayment is determinable, or whether it results from the issue really litigated upon the trial and herein discussed. However, it is inevitably within the reach of the dictated stipulation already quoted; and the briefs make no point concerning it. The court, therefore, follows in that behalf the stipulation of counsel.