## LAFLIN et al. v. UNITED STATES.
### Civ. No. 66–50.

United States District Court
D. Nebraska, Lincoln Division.
Sept. 18, 1951.

Lyle C. Holland and Chambers Holland & Groth, all of Lincoln, Neb., for plaintiffs.

Joseph T. Votava, U.S.Atty., of Omaha, Neb., for defendant.

DELEHANT, District Judge.

The plaintiffs, husband and wife, citizens of Nebraska, and residents of this division of the court, demand judgment against the defendant for $2,038.85 with interest, on account of additional income taxes which they allege were by or in behalf of the defendant wrongfully assessed against and collected from, and paid by, the plaintiffs for the year 1945.

Jurisdiction clearly exists under title 28 U.S.C.A. § 1346(a). The statutory prerequisites to suit set out in Title 26 U.S.C.A. § 3772(a) have been complied with. It is true that in its answer to the complaint the defendant denies the taking by the Commissioner of any final action on the plaintiffs' claim for refund. But incident to that question, it is admitted, and upon the trial was shown, that the collector on August 11, 1949, in writing notified both the taxpayers and their attorney of the re-

jection of their claim theretofore duly and admittedly filed. In any event, the suit was not commenced earlier than is allowed by Title 26 U.S.C.A. § 3772(a)(2); and no claim is made that it was brought tardily.

The plaintiffs seasonably made a joint income tax return on Treasury Department form 1040 for the year 1945 in which they reported upon a cash receipts and disbursements basis.

The parties have presented the single question whether the profits from the sales in 1945 of certain cattle raised by the plaintiff Lewis Laflin (hereinafter referred to by his full name only) were returnable for income tax purposes as ordinary income or as long term capital gains.

This court lately considered in a somewhat different factual context the manner in which profits from the sale of cattle by one engaged in the breeding and raising of beef cattle should be accounted for in returns for income tax purposes. Miller v. United States, D.C.Neb., 98 F.Supp. 948. While it was not originally intended that the cited opinion should be reported, that intention was recently abandoned upon request and the opinion has been published. Reference is now made without repetition to that opinion with which counsel are fully familiar and in which all of the earlier decisions bearing upon the subject are mentioned and discussed. More recent rulings are Mitchell v. United States, D.C. Cal., 96 F.Supp. 473; Davis v. United States, D.C.Iowa, 96 F.Supp. 785; Retz v. Birmingham, D.C.Iowa, 98 F.Supp. 322, and Fox v. Commissioner, 16 T.C. 854, of which the case last cited has been discussed by counsel in their briefs in this action and will be adverted to later in this memorandum. No discussion need be offered concerning the other three cases which essentially reach the same result as Miller v. United States, supra, and follow the same reasoning and authority.

The facts touching the nature of the cattle breeding operations out of which this suit arises will now be set out.

Lewis Laflin had in 1945 and still has several occupations and sources of income, of which only his cattle breeding enterprise need be considered on this occasion.

He was associated with his father until the latter's death in 1932, and thereafter has been engaged as sole owner, in the breeding, raising and sale of purebred Aberdeen Angus cattle. The members of his herd are registered with the American Aberdeen-Angus Breeders Association which maintains records of such herds, including data pertaining to the births, sales and other transactions respecting the individual animals identified therein. The gross number of his cattle is not and has not been constant. In 1945 he had about 300 animals of both sexes and all ages of the exact classification of which for default of evidence no finding is possible. At the time of the trial late in June, 1951, he had 118 breeding cows, 50 heifers and 18 bulls.

His animals have consistently been valuable principally as breeding stock and his aim in making sales from the herd has been to sell cattle raised by him at the highest available prices presumptively for use, or resale by their purchasers, as breeding animals. From time to time, however, in culling operations he sells on the general market as beef cattle animals which either have reached, or are approaching, the end of their profitable breeding terms or seem undesirable for one reason or another as breeding cattle. Heifers are bred when they reach their reasonably probable fertile ages, and this is done irrespective of whether they are to be kept by Lewis Laflin for breeding purposes or sold to other breeders. In the latter alternative the pregnancy of a heifer with an unborn calf sired by one of his registered bulls is considered by him, and found by the court, to enhance the heifer's sale value in the breeding market. Bull calves are not ordinarily, or in the absence of some depreciating breeding factor, castrated and sold as steers. They are generally kept in their native and developing sexual potency and sold as herd bulls to other breeders. For his own herd bulls he regularly buys young bulls from other herds and does not use bulls of his own raising. To this practice there is an occasional exception in his use of bulls produced in his herd for so-called "line breeding".

In 1945 Lewis Laflin sold from his herd more animals than his average annual

sale volume. Exactly how many more may not be found with assurance. He testified that he sold in that year about 100 more cattle than his average number of sales per year. That figure is being accepted by the court, despite the absence of any data by which it may be tested or verified. In fact, the exact number of cattle sold by him in 1945 in all ways and for all purposes is not clearly reflected in the evidence. It may reasonably be considered that the enlarged selling in 1945 is substantially reflected in the sales of cows to Calizona Land & Cattle Co., hereinafter mentioned, although some of it was probably involved in some of the other sales studied in this memorandum and in his sales of cattle bought by him and in his sales on the beef cattle market of culled or cut back elements of his herd, neither of which last two operations is reflected by detailed analysis in the evidence or is susceptible of critical examination by the court. (See next paragraph.)

As has just been suggested, certain of his cattle sales in 1945 are not drawn directly in question in this litigation. In their return the plaintiffs claimed a small loss on the sale for $8,200.48 of registered cattle purchased by him and resold. And they reported among receipts in the way of ordinary income the sale for the gross sum of $6,621.21 of cattle raised by him which were sold on the general cattle market and not as breeding stock. Beyond noting such sales and the manner of their return the court does not proceed. Specifically, no suggestion is to be inferred that the court considers that the sale of cattle culled out of the breeding herd and sold on the beef cattle market necessarily involved the receipt of ordinary income. That question is not involved and is not decided.

What is in controversy is the classification for income taxation purposes of the profit on the sale, directly or indirectly, to sundry other breeders, for the aggregate price of $23,818.42, of some 140 cattle all raised by Lewis Laflin. The plaintiffs reported the item as a long term capital

gain, and as within the reach of Title 26 U.S.C.A. § 117(j)(1). The Commissioner treated it as ordinary income, and, on that premise, exacted and collected the additional tax whose recovery the plaintiffs seek. The court is persuaded that neither the position of the plaintiffs nor that of the Commissioner may be accepted as to all of the cattle whose sale is involved, but rather that the plaintiffs' claim is clearly well founded as to certain of the animals and unproved and not maintainable in respect of the others.

Quoted again, as it was in Miller v. United States, supra [D.C.Neb. 98 F.Supp. 953.], is the following test of the applicability of Section 117(j)(1), defined in Albright v. United States, 8 Cir., 173 F.2d 339: "In order for the taxpayer to come within the provisions of section 117(j) permitting him to treat the sales from his dairy and breeding herds as sales of capital assets, the burden is upon him to show: (1) that the animals sold were used in his trade or business; (2) were subject to allowance for depreciation; (3) were held for more than six months; (4) were not property of the kind includible in the inventory of the taxpayer if on hand at the close of the taxable year; and (5) that the animals were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

That all of the animals with the exception of eight heifers,[1] were held for more than six months and thus meet the test in item (3) is obvious. Counsel have appropriately devoted little attention to this point. Upon the grounds discussed in the Miller case the court holds without repititious discussion that items (2) and (4) are also met in this action, in which ruling it rejects the position to the contrary of the defendant. Items (1) and (5) remain and are the controlling factors. And it is in applying them to the individual cattle whose sales are under examination that the court reaches different results in respect of one group of animals from those reached as to the other group.

---

1. The fact that each of those eight heifers was under six months of age is not important in the ruling, for the profits from their sale are classified on other grounds as being reportable as ordinary income.

■■ The court finds that none of the animals listed in "group I", infra, was ever used in Lewis Laflin's trade or business or a real part of his breeding herd and that all of them were held primarily for sale to customers in the ordinary course of his trade or business. It, therefore, follows, that as to them the plaintiffs have failed to sustain the burden of proof imposed upon them by the applicable statute and under the reasoning of Albright v. United States, supra. The list follows:

## Group I

| Name of Purchaser | Number sold | Type | Appropriate ages (omitting fractions of months) | Price |
|---|---|---|---|---|
| Owen Rist | 1 | Bull | 9 months | $ 150.00 |
| Gus Harms | 1 | Bull | 1 Yr. 7 Mos. | 134.50 |
| Millard Walton | 62 | Cows | oldest 1 Yr. 10 Mos. youngest 3 Mos. | 8,900.00 |
| Nick Thinnes | 1 | Bull | 1 Yr. 4 Mos. | 350.00 |
| Calizona Land & Cattle Co. | 2 | Bulls | one 1 Yr. 10 Mos. one 1 Yr. 9 Mos. | 300.00 [2] |
| L. R. Kershaw | 8 | Bulls | oldest 1 Yr. 10 Mos. youngest 1 Yr. 5 Mos. | 1,583.92 |
| Anzel Hager | 2 | Bulls | both 1 Yr. 8 Mos. | 285.00 |
| Edd Williams | 1 | Bull | 1 Yr. 8 months | 100.00 |
| A. H. Bauers | 1 | Bull | 1 Yr. 3 months | 150.00 |
| J. Y. Ranch | 16 | Bulls | oldest 1 Yr. 3 Mos. youngest 11 months | 3,600.00 |
| A. F. Brubaker | 1 | Bull | 8 months | 150.00 |
| H. C. Jones | 6 | Cows | oldest 1 Yr. 8 Mos. | |
| " " | 3 | Bulls | youngest 1 Yr. each 1 year | 1,950.00 |
| August Falk | 1 | Bull | 1 Yr. 5 months | 150.00 |
| | | | Total ............... | $17,803.42 |

Many of the animals embraced within Group I were young bulls. Unlike the male animals born into an unregistered beef cattle breeding herd, their prime sale value was as uncastrated breeding bulls. It is too obvious to require fortifying discussion that the ordinary purpose of raising and keeping them was their sale at opportune times to other breeders of like cattle. Therefore, the plaintiffs can not be considered as having proved that they "were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Similarly, as the court is persuaded, they were never a part of the Laflin breeding herd, and, therefore, were not used in the Laflin purebred cattle trade or business. The ages of the several bulls sold make the previous use for breeding purposes of any of them highly improbable and of most of them quite impossible. The unlikelihood of such use in the herd into which they were born is further supported by the familiar practice among breeders of purebred cattle of purchasing their herd bulls from other

2. The figure of $300.00 is frankly an estimate only. The two young bulls were sold with a large group of cows of varying ages, all for a gross price of $5,790.00. The prices for the bulls were not segregated in the sale. But it is fairly inferable from the prices obtained for bulls of like ages raised in the same herd that approximately $150.00 per animal would be the allocable portion of the gross consideration arising from the inclusion in the sale of those two animals.

breeders and thereby avoiding the problem of breeding between closely related animals. And so far as Lewis Laflin's occasional practice of "line breeding" requires consideration, it may be noted that his testimony on the point did not extend to any specific animal among the list involved, and that the practice even with him was not the ordinary one.

The other animals in Group I are the sixty-two so-called cows sold to Millard Walton and the six similar units sold to J. Y. Ranch. In any reasonable understanding, all of those animals were heifers. Of those sold to Walton, eight were under six months of age (those mentioned in footnote 1) and the group varied in age up to twenty-two months. Of those sold to J. Y. Ranch one was a day less than one year old, two fourteen months, one fifteen months and the other two twenty months old. Admittedly none of the entire sixty-eight had ever had a calf, and, with virtual certainty, a large number of them were not pregnant and many of them, as their ages demonstrate, had never been exposed to pregnancy. The picture concerning them is clear. Along with the young bulls already discussed, they were the principal Laflin "money crop" in cattle for 1945; and his major sales of such animals for the period were those to Walton, Kershaw and J. Y. Ranch.

The court is convinced and finds that reasonably regarded none of the heifers thus sold had ever been units of the breeding herd or used in the Laflin cattle trade or business. It appears to be equally certain that they were held primarily for sale to customers in the ordinary course of Lewis Laflin's trade or business. It follows that, as to the heifers, too, the plaintiffs have not sustained their burden of proving

items (1) and (5) of the test proposed in the Albright case, or either of them.

Accordingly, and especially recalling that, admittedly and demonstrably, the major item of income from the Laflin cattle operation was derived from the sale as breeding stock of registered cattle of the character identified in the list of animals for which the gross returns now involved were obtained, the court holds that profits from the sale of the cattle in Group I were and are taxable as ordinary income.

To hold otherwise in respect of those young bulls and heifers, most of which at their respective sale times were just approaching or entering their breeding periods, and a few of which were still merely calves, would appear to the court to involve unreality and absurdity in the light of the nature of the Laflin cattle business. That business necessarily has in view some primary source of income for which it produces its cattle. And that source of income is naturally the sale of its young bulls and heifers to the attractive breeder trade. And this is true of the heifers whether when sold they are bred or not, for in that market their pregnancy invites a premium, whereas on the beef market it encounters a dock in price. So, especially upon the test item (being No. 5) of the primary purpose of their holding by the taxpayer, the court holds against the plaintiff and finds that all items in Group I were held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. And as to them, test item (1) is also found not to have been met, for none of those animals were used in their owner's trade or business.

The other cattle in question are now identified as Group II.

## GROUP II

| Name of purchaser | Number Sold | Type | Approximate ages (Omitting fractions of months) | Price |
|---|---|---|---|---|
| Harry Weyers | 2 | cows | One 3 Yrs. 5 Mos. and one 3 Yrs. | $ 300.00 |

| Calizona Land & Cattle Company | 31 | cows | oldest 9 Yrs. 1 Mo. youngest 2 Yrs. 5 Mos. | 5,490.00 [3] |
|---|---|---|---|---|
| Calizona Land & Cattle Co. | 1 | cow | 3 Yrs. 7 Mos. | 225.00 |
| | | | Total ................ | $6,015.00 |

Of the group of thirty-one cows only six were under three years of age (including four which had nearly reached that age). Most were five or more years old, and a substantial number seven, eight or nine years of age. Recognizing that they were sold in a group for a bulk price, it is fairly inferable that they fitted reasonably into a common pattern or type. They were breeding cows, of which all or nearly all, had had at least one calf and many had had several. Possibly some of the younger animals in the group were approaching their first calvings (for the sale occurred on February 17, 1945, thus on the eve of spring). But the court is convinced by their ages and the manner of their grouping for sale, first that prior to and at the time of their sale they had been placed in the breeding herd and were being used in Lewis Laflin's trade or business of cattle breeding, and secondly, that prior to and at the time of their sale, he had held and did hold them primarily as breeding cows and not "primarily for sale to customers in the ordinary course of his trade or business". Therefore, as to them he is considered to have established items (1) and (5) of the test defined in the Albright case. And what has been said of the cows involved in the large Calizona sale applies also to those sold to Weyers and to the isolated sale to the Calizona Company.

In its present study the court has carefully considered the tax court's opinion in Fox v. Commissioner, supra. It is unnecessary to signify either complete approval or particular disapproval of the ruling there reflected, in the setting in which it was made. The record before this court, though somewhat comparable to, is not identical with, that reported upon in the Fox case. Upon this record the court has not been moved, as was the Tax Court in the Fox case, to the prescription of inflexible and perhaps arbitrary ages as the measure either of inclusion in the taxpayer's breeding herd or of the primary purpose of his holding, of the animals under study. Nor does this court think that the actual delivery of a calf by a female bovine animal is, at least in the present context, the inevitable test of her inclusion in the taxpayer's breeding herd. The instant record seems neither to require nor to justify or support such a course in proceeding to decision in the present case.

Reference may be made finally to a Treasury Department bulletin dated June 17, 1951, advising collectors of internal revenue and others of the then effective position of the Commissioner of Internal Revenue touching the application of Title 26 U.S.C. § 117(j), especially in the light of the decision in United States v. Bennett, 5 Cir., 186 F.2d 407. Paragraph 4 of that bulletin is in this language: "It is the present position of the Bureau that gains derived from the sale of dairy, draft, or breeding animals are to be recognized as coming within the purview of section 117(j) of the Code if the taxpayer establishes that the particular animals sold were actually used for dairy, draft, or breeding purposes for substantially their full period of usefulness. If such animals are sold prior to such full period of usefulness, the taxpayer must show that they were added to the herd for substantial use in such herd and not temporarily with the object in view of an early sale. Gains derived from the sale of breeding animals which were used for the production of only one offspring or litter of offspring will not be subject to the capital gains treatment prescribed by section 117(j) of the Code.

3. The amount is determined by deducting the estimated price for the two young bulls (footnote 2) from the agreed gross sale price of a total of thirty-four cattle.

Animals which are used only temporarily as breeders or producers, including ordinarily hogs, chickens and turkeys, will not be subject to the capital gains treatment prescribed by section 117(j) of the Code."

■ Preserving and observing towards rulings of the Bureau the attitude expressed by the Court of Appeals in Albright v. United States, supra, and by this court in Miller v. United States, the court, nevertheless, can not accord to the Bureau or the Commissioner the prerogative of statutory amendment. To the extent to which the quoted language proposes rational standards by which the indulgence allowed by section 117(j) may be measured and administered, it is entitled to and in this court receives respectful consideration but not slavish acquiescence. To the extent to which, in its grudging acceptance of the judicial construction of that section, it obviously seeks, through the device of interpretation, to minimize or chisel away the advantages erected by the statute, the latter is the source and language of the law by which the court must be guided.

■ So, this court does not accept as a realistically valid test of a cow's actual use or primary holding for breeding purposes, the requirement that she be so used "for substantially her full period of usefulness". To be sure, if she has been so used, she ordinarily meets any fair test of such use and purpose of bona fide holding. But she is equally so used and kept if once sincerely introduced into the breeding herd by her owner, she is sold long before the termination of her breeding career because of some intervening change either in her adaptability or in his circumstances or intentions. Of the second sentence of the quoted paragraph of the bulletin, the court has no substantial criticism. Certainly use as a breeding cow should be the primary purpose of her keeping by a breeder who has raised her and on her sale, treats his resulting profit as a capital gain; and he carries the burden of proving it. But the last two sentences of the quoted material may not receive unreserved and invariable approval. In some factual settings the thoughts reflected by them may provide

persuasive reasons for the rejection of claims to capital gains treatment. But their manifest effort to limit the measurement of the use and purpose of holding of the animals within their reach to a single narrow consideration, rejecting all others, is invalid and intolerable. Neither the statute under analysis nor the decisions construing it justify the attitude which those sentences reflect. To say no more, they betray a disedifying unwillingness either to accept the prevailing judicial construction and application of section 117(j) or to seek its more decisive and controlling definition by congressional action.

Mention of congressional action prompts attention to the fact that proposed revenue legislation pending before the congress as of the time of the preparation of this memorandum, contains language prospective in its operative effect, which for the future may clarify the subject in some measure. But it has not yet been enacted. And if and when it shall be approved it will not be retroactive, so far as now appears.

The thought may be prompted that some inconsistency exists between the results announced in this action and those arrived at by the same judge in Miller v. United States, supra. It will be unfounded. Any apparent disparity arises from the very real differences between Mills' operations involved in the Miller case and those of Lewis Laflin. No possible question can arise of difference in the treatment in the two cases of profits from the sales of cows once actually introduced into the breeding herds and held thereafter primarily as parts of the taxpayers' breeding herds. Nor is there any real variation in the treatment in the two cases of profits from the sales of male calves raised in the herds. In each case they have been regarded as naturally and normally salable to customers and held primarily for that purpose and, therefore, subject to treatment in respect of profits from their sales as ordinary income. The only animals concerning which unlike results may be thought to have occurred are what the court has classified in both instances as heifers. But the difference in result is attributable to

a real difference in fact. The record in the Miller case satisfactorily established the definitive inclusion of the heifers in the breeding herd. That in this case does not but, rather, points clearly to its negation. Their breeding to bulls (insofar as it is indecisively shown in this case) is one, though not the only—factor which has led to opposite conclusions in the two cases. In Miller's case it was an advantage to the owner if the heifers remained in the herd, a detriment if they were sold. Here it was an advantage in either alternative, and especially in the event of sale. Besides, the very nature of the purebred cattle breeding business requires that many of the female calves produced in a herd be sold as a part of the producer's regular and expected "crop", and suggests a course of action on the owner's part who insists that he has permanently introduced heifers into his breeding herd, much more decisive than that required for the like purpose of an owner of a range herd of beef cattle. The two cases are factually different especially in their records touching heifers.

The court's order and judgment, therefore, will be in favor of the plaintiffs and against the defendant for the sum (together with interest thereon from date of payment) by which their total tax payments for 1945, including interest, exceed the amount of tax with interest which should have been exacted from them by treating the profits on the sale for $6,015.00 of the cattle included in Group II as long term capital gains, and the profits on the sale for $17,803.42 of the cattle included in Group I as ordinary income, and will be in favor of the defendant and against the plaintiffs in respect of so much of their demand as exceeds the sum for which judgment in their behalf is announced herein.

Counsel for the defendant will make ·or procure an accurate computation of the amount of such judgment and prepare a form of judgment in harmony with this announcement, and submit the form of judgment and computation to counsel for the plaintiffs for approval or suggested correction, and on approval to the court for entry. If objection be made or correction suggested in respect of the computation or

form of judgment the issue thus arising shall be presented to the court on notice for settlement.

Exception is allowed to the plaintiffs as against the court's ruling incident to the animals in Group I and to the defendant as against the ruling incident to the animals in Group II.